2018 UT App 196

## THE UTAH COURT OF APPEALS

DONOVAN TODD STEPHENS,
Appellee and Cross-appellant,

*v.*

BRIDGET NICOLE STEPHENS,
Appellant and Cross-appellee.

Opinion
No. 20170440-CA
Filed October 12, 2018

Third District Court, West Jordan Department
The Honorable James D. Gardner
No. 104400395

Jennifer R. Jackson, Attorney for Appellant
and Cross-appellee

Angilee K. Dakic and Amy F. Hugie, Attorneys for
Appellee and Cross-appellant

JUDGE KATE A. TOOMEY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

TOOMEY, Judge:

¶1    Bridget Nicole Stephens (Mother) appeals the district court's judgment on a petition to modify a decree of divorce, and Donovan Todd Stephens (Father) cross-appeals the same judgment. Mother argues that the district court erred when it awarded Father sole physical custody of the parties' minor child (Child), asserting the modified decree met the statutory requirements for joint physical custody. Mother further argues the court erred when it calculated Mother's child support obligation on the award of sole physical custody to Father, asserting it should have used a joint physical custody worksheet. Father cross-appeals, asserting the district court erred when it

denied his requested relief for parent-time modification. We affirm with respect to the sole physical custody designation and the child support award. But we reverse and remand for the district court to make additional findings with respect to the parent-time award and, after doing so, to adjust its order as necessary.

BACKGROUND

¶2     Father and Mother divorced in 2011. The parties were awarded joint legal custody of Child, but Father was awarded sole physical custody subject to Mother's liberal parent-time. Under the parent-time arrangement, Child stayed overnight with Mother for more than thirty percent of the year. Because Mother was unemployed, her child support obligation was calculated based on an imputed minimum wage.

¶3     Four years later, Father filed a petition to modify the divorce decree, asserting that a substantial and material change of circumstances supported a reduction in Mother's parent-time and an increase of Mother's child support obligation. As to parent-time, Father claimed Mother had abused Child. The abuse allegation was based primarily on a supported finding of child abuse by the Utah Division of Child and Family Services (the DCFS Finding). With regard to the child support issue, Father claimed Mother had returned to work and asked for a modification based on her new income.

¶4     Mother answered the petition, denying the abuse allegation. Mother also filed a counter-petition to modify, asking for an award of joint physical custody that designated her as primary custodian. Mother's counter-petition alleged Father did not communicate with her about Child, Father "failed to work with [Child]" regarding Child's learning difficulties, and that she was "concerned about [Child's] nutrition and hygiene while in [Father's] custody." Mother acknowledged her new employment

and asked that child support be modified "based on the parties' current income and the parent-time ordered, in compliance with [Utah's] child support guidelines."

¶5    Based on the DCFS Finding, the district court entered a temporary order, greatly reducing Mother's parent-time, terminating her overnight parent-time, and requiring supervision during all visits. The district court also appointed a private guardian ad litem (the GAL) to represent Child's best interest. The GAL was to make recommendations regarding the alleged abuse and whether Mother's parent-time should be supervised.

¶6    The GAL interviewed Child, who reported "substantial communication issues" with Mother, as well as physical and emotional abuse. For example, Mother called Child "fat" and "stupid," causing Child "distress and problems with her self-image." Mother also "required" Child to call her every day, and if Child missed a call, Mother became angry with her. In addition, Child described witnessing episodes of violence by Mother directed toward one of Mother's other children and Child's step-father.

¶7    Child also detailed the incident that gave rise to the DCFS Finding. According to Child, Mother was upset because Child had not called her the previous night. Mother asked Child "what goes on in her head," while forcefully and repeatedly jabbing and poking Child's face, then hit Child's leg with a fist. Child ultimately told the GAL she was "terrified of [Mother]" and would fear for her safety sleeping at Mother's house if the overnights resumed. Child feared Mother would "speak to her inappropriately, hit her, or lash out at her in other ways."

¶8    The GAL next interviewed Mother and was "openly shocked" at the way Mother communicated about Child. The GAL noted it was easy to understand why Child thought Mother

called her "fat" or "dumb," "despite different verbiage or use of words."

¶9     The GAL also interviewed Child's personal therapist. The personal therapist began treating Child for anxiety at school, but the treatment evolved to include Child's relationship with Mother and a potential diagnosis of post-traumatic stress disorder resulting from the incident that gave rise to the DCFS Finding. The personal therapist concluded that Mother's damaging comments and the domestic violence toward Child had created Child's anxiety and caused her relationship with Mother to become "toxic." Child constantly worried about their interactions because at "any moment [Mother] could go off."

¶10    Based on the investigation, the GAL recommended the court adopt a provisional "step-up" parenting plan. That plan eventually eliminated supervision during Mother's visits, and allowed Mother a path to regain the parent-time awarded in the original divorce decree. The plan gradually increased Mother's visits each week, with a return to parent-time as established in the original decree after a successful six-week period. The GAL recommended continued therapy for Mother and Child as well as feedback from the therapists as the process moved forward. Also, the plan made returning to the original parent-time schedule contingent on Mother refraining from further abusive behavior. If Mother engaged in additional incidents of violence or abuse directed at Child, the step-up plan would cease immediately and Mother's parent-time would return to what it was under the temporary order.

¶11    The district court also received evidence at trial. Father detailed his understanding of the incident giving rise to the DCFS Finding and testified to Mother's other violent outbursts. Father also testified that Child smoked marijuana during a supervised visit at Mother's house. Ultimately, Father asked the court to adopt an extended step-up plan that would allow

Mother overnight parent-time only after six months and cap Mother's potential parent-time at the statutory minimum under Utah Code section 30-3-35.

¶12 Mother also testified, denying Child's version of the incident giving rise to the DCFS Finding. Mother admitted "tapping" Child on the head, but she disputed the number of taps, and denied hitting Child's leg. In addition, Mother denied that Child smoked marijuana at Mother's house. Mother ultimately asked the court to award joint physical custody, identifying her as primary custodian.

¶13 The court also considered "affidavit-style answers" to the parties' questions submitted by the Child's personal therapist and Mother and Child's reunification therapist. The personal therapist reported Child's symptoms of post-traumatic stress disorder and recommended continued personal and reunification therapy to increase Child's "feelings of safety in the presence of [M]other." The personal therapist said she felt a step-up plan was appropriate, but she believed Child and Mother needed more than six weeks for reunification therapy before the plan was set in place. The personal therapist also recommended a "safety plan" to assist Child in the eventual transition back to increased, overnight parent-time with Mother, and to reduce the risk of physical violence that Child felt was "high as changes in [parent-time] [were] being addressed." That safety plan included (1) allowing Child to have her phone with her at all times when she is with Mother, (2) allowing Child to state "I feel unsafe right now" and go to a secluded area for at least half an hour of alone time, and (3) requiring a lock on Child's bedroom door at Mother's house that Child could lock before going to sleep.

¶14 The reunification therapist explained, "[Child] and [Mother] have been able to do some repair in their relationship, but it is both mine and [Child's] opinion that the work isn't

completed and family therapy should continue." The reunification therapist said Child was still working to develop "some power in the relationship between her and [Mother]" and that "it is going to likely require a combination of more counseling (both individual and family) and getting older and more mature." The reunification therapist said she believed the six-week step-up plan was "appropriate because it gives [Child] a chance to . . . get used [to] the changes gradually."

¶15   After considering the evidence, the district court entered an order supported by findings of fact and conclusions of law. First, the district court found Mother's abuse of Child constituted a significant and material change in circumstances warranting modification of parent-time. The findings stated that the abuse was "well documented," citing the DCFS Finding, Child's confirmation of that finding, and Father's testimony regarding the incident. The district court also found Mother had made other "violent outbursts in the presence of or directed at" Child, and that Child used marijuana at Mother's house during a supervised visit. The court concluded Child was suffering from post-traumatic stress disorder, and her relationship with Mother had become strained.

¶16   Despite the findings of abuse, the district court found the relationship between Mother and Child had improved through temporary parent-time restrictions and counseling. As such, the district court concluded it remained in Child's best interest that the original custody order remain in place—that Father retain sole physical custody and Mother have parent-time as set forth in the original decree—subject to a "step-up" plan.

¶17   The district court granted, in part, Father's petition to modify. First, it ordered the immediate adoption of the six-week step-up plan (without supervision), and the "safety plan," as recommended by Child's personal therapist. To support that modification, the court relied on the declarations of both the

personal therapist and the reunification therapist "that a step-up and reunification plan [were] in the best interest of [Child]." Additionally, the district court ordered that Child continue personal therapy, and that Mother and Child continue reunification therapy until the reunification therapist determined, "with input from [Child]," it was no longer necessary. The court also conditioned the return to the original parent-time arrangement, noting that if Mother engaged in additional episodes or incidents of violence or physical abuse against Child, the step-up plan would cease immediately and supervised visits would be restored in accordance with the terms of the temporary orders.

¶18 The court also modified the parties' child support obligations to an amount consistent with Mother's new income, noting that "[b]oth parties acknowledged that there was a material change in circumstances related to [Mother's] employment status and this was not a contested issue in this case." It made the calculation based on the sole physical custody calculation in Utah Code section 78B-12-205.

¶19 Mother appeals and Father cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶20 Mother contends the district court erred in two respects. She argues it should not have granted sole physical custody to Father, asserting the modified order satisfies Utah's statutory definition of joint physical custody. Next, Mother contends the court erred by not using a joint physical custody child support worksheet to calculate her obligation. "A [district] court's interpretation of a statute is a question of law that we review for correctness." *Spall-Goldsmith v. Goldsmith IV*, 2012 UT App 302, ¶ 6, 288 P.3d 1105 (quotation simplified). Otherwise, this court reviews the district court's decision whether to modify a custody

award and an award of child support for an abuse of discretion. *Woodward v. Woodward*, 709 P.2d 393, 394 (Utah 1985).

¶21 Father cross-appeals, contending the district court erred in failing to modify the parent-time order and award Mother only the statutory minimum amount of parent-time, as requested in his petition to modify. He argues "the [district] court's findings supporting denial of [Father's requested] parent-time modification are not clear and are contrary to the evidence." This court reviews a district court's parent-time determination for abuse of discretion. *See Trubetzkoy v. Trubetzkoy*, 2009 UT App 77, ¶ 7, 205 P.3d 891.

ANALYSIS

I. Custody Designation

¶22 Mother argues the district court erred by awarding Father sole physical custody. We disagree. Mother failed to show a substantial and material change in circumstances justifying a change to the custody designation. Thus, the original custody order appropriately remained unchanged in that regard.

¶23 Under Utah law, there is "neither a preference nor a presumption for or against joint physical custody or sole physical custody." Utah Code Ann. § 30-3-10(5) (LexisNexis Supp. 2017). Instead, "the court and the family [have] the widest discretion to choose a parenting plan that is in the best interest of the child." *Id.* Joint physical custody "means the child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the child in addition to paying child support," *id.* § 30-3-10.1(3)(a), in appropriate cases.

¶24 Once the district court makes an initial custody determination, it "has continuing jurisdiction . . . and may later make such changes in custody provisions as it determines are

reasonable and necessary for the welfare and best interests of the child." *Hogge v. Hogge*, 649 P.2d 51, 53 (Utah 1982) (quotation simplified). But before the district court may modify custody, the moving party must first show changed circumstances that warrant reconsideration of the issue. *See id.* Once the district court finds such changed circumstances, it considers the best interest of the child to decide "the manner in which custody should be modified, if at all." *See id.* A district court "is given broad discretion" in deciding whether to modify custody, and "its decision will not be disturbed absent a showing of an abuse of discretion or manifest injustice." *Maughan v. Maughan*, 770 P.2d 156, 159 (Utah Ct. App. 1989).

¶25    Here, the district court awarded Father sole physical custody in the original divorce decree. In Mother's counter-petition, she asked the district court to change that designation to joint physical custody and award her primary custody. But the court denied Mother's request, finding that Mother had not met her burden. Although the court noted "that [Father] has not shared all important information with [Mother] in a timely manner," and that "both parties testified that [Child] struggles with schooling," the court found there was insufficient "credible evidence that changing parent-time or custody as requested by [Mother] would resolve these struggles—particularly given the abuse findings."

¶26    The district court did not abuse its discretion when it denied Mother's request to modify the custody designation. Father's actions, and the lack of communication between Mother and Father, do not "indicate that the custodial circumstances of [Child] or the parenting capabilities of [Father]" have been affected. *See Becker v. Becker*, 694 P.2d 608, 611 (Utah 1984). Thus, the court acted within its discretion in denying Mother's counter-petition to modify custody.

¶27    Further, the parent-time modifications the court made did not require an alteration of the physical custody designation. The district court granted, in part, Father's petition to modify parent-time. First, it implemented the temporary order, greatly limiting Mother's parent-time. Next, the court ordered the step-up plan, allowing Mother to regain the parent-time she was awarded in the original divorce decree so long as she satisfied the plan's conditions. Those modifications, however, did not necessarily affect the award of custody as designated in the original divorce decree. The court specifically found the custody arrangement as entered in the original decree remained in Child's best interest and would remain in place. Because Mother did not establish a change in circumstances warranting reconsideration of the issue, the original order remained unchanged regarding Father's sole physical custody designation and the court was not required to modify the physical custody designation.[1]

## II. Child Support

¶28    Mother next argues the district court failed to comply with Utah's statutory child support guidelines when it used a sole physical custody worksheet to calculate her child support obligation. We disagree. Because the step-up parenting plan

---

1. Much of Mother's argument centers on her assertion that Child currently stays overnight with Mother for more than thirty percent of the year as required for joint physical custody under Utah law. *See* Utah Code Ann. § 30-3-10.1(3)(a) (LexisNexis Supp. 2017). But, as we discuss *infra* ¶ 30, Mother's parent-time under the district court's order was contingent on successful completion of the step-up plan. Any remedy Mother may have with respect to the physical custody designation following her successful completion of the step-up plan lies with the district court.

allowed Mother the time required for joint physical custody only after six weeks, contingent on Mother's actions, the modified parent-time order did not meet the requirements for a joint physical custody child support calculation.

¶29  Under the Utah Child Support Act, child support obligations are generally calculated using a worksheet in cases of joint physical custody. *See Spall-Goldsmith v. Goldsmith IV*, 2012 UT App 302, ¶ 8, 288 P.3d 1105; *see also* Utah Code Ann. § 78B-12-208 (LexisNexis 2012). Moreover, for purposes of calculating child support, the designation of "joint physical custody" or "sole physical custody" is not as important as whether the custody arrangement "exceed[s] the [statutory] threshold for joint physical custody." *See Udy v. Udy*, 893 P.2d 1097, 1100 (Utah Ct. App. 1995) (concluding that the district court erred when it used a sole custody child support worksheet when "[a]lthough labeled 'sole custody,' the [district] court awarded [the father] [parent-time] that exceeded the [statutory] threshold for joint physical custody"). In Utah, a custody plan meets the requirements for joint physical custody when "the child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the child in addition to paying child support." Utah Code Ann. § 78B-12-102(15) (LexisNexis Supp. 2018). When those requirements are met, a court must "use a joint [physical] custody child support worksheet . . . [or] make findings supporting its deviation." *Spall-Goldsmith*, 2012 UT App 302, ¶ 8 (quotation simplified).

¶30  Here, the district court modified child support and was thus required to make the modification consistent with the Utah Child Support Act. The parties agree that the modified divorce decree awarded Mother a path to obtain overnight parent-time with Child for more than thirty percent of the year. But under the modified decree, Mother could not achieve such parent-time until after successfully completing the six-week step-up plan. Further, Mother's increased parent-time was conditioned on her

refraining from engaging in further abusive behavior toward Child. Thus, at the time the court entered the order, Mother was not entitled to overnight parent-time with Child for more than thirty percent of the year. Accordingly, the modified decree did not meet the requirements for joint physical custody under Utah Code section 78B-12-102(15), and the district court was not required to use a joint physical custody worksheet to calculate Mother's child support obligation.

## III. Parent-Time

¶31    Father argues the district court erred in denying his requested relief for parent-time modification. He contends "the district court's findings supporting denial of [his requested] parent-time modification are not clear and are contrary to the evidence." We agree that the court's findings in support of the parent-time modification were not sufficiently detailed to inform the parties of the court's reasoning or facilitate meaningful appellate review. *See Lay v. Lay*, 2018 UT App 137, ¶ 28 (concluding that "the district court's findings were inadequate to disclose the steps by which the court reached its ultimate conclusion" regarding modification of a parent-time agreement).

¶32    "[District] courts have continuing jurisdiction to consider motions to modify dealing with child custody and [parent-time]," *Kallas v. Kallas*, 614 P.2d 641, 645 (Utah 1980), and to make such modifications "as [they] determine[] are reasonable and necessary for the welfare or best interests of the child," *Hogge v. Hogge*, 649 P.2d 51, 53 (Utah 1982) (quotation simplified); *see also* Utah Code Ann. § 30-3-5(3) (LexisNexis Supp. 2017) (recognizing the district court's continuing jurisdiction over child custody and child maintenance determinations).

¶33    The district court's decision to modify a decree of parent-time "must involve two separate steps." *Hogge*, 649 P.2d at 54. First, the court must find that the petitioner has made "*some*

showing of change in circumstances" that would support a modification of parent-time. *Jones v. Jones*, 2016 UT App 94, ¶ 10, 374 P.3d 45; *see id.* (explaining that the showing of a change in circumstance when a district court alters parent-time arrangements "does not rise to the same level as the substantial and material showing required when a district court alters custody"). Second, the court "must consider the changes in circumstance along with all other evidence relevant to the welfare or best interests of the child . . . [to] determine de novo which custody arrangement will serve the welfare or best interest of the child, and modify, or refuse to modify, the decree accordingly." *Hogge*, 649 P.2d at 54.

¶34 "[T]he [district] court's proximity to the evidence places it in a better position than an appellate court to choose the best custody arrangement." *Trubetzkoy v. Trubetzkoy*, 2009 UT App 77, ¶ 6, 205 P.3d 891. Thus, we generally "will not disturb the [district] court's [parent-time] determination absent a showing that the [district] court has abused its discretion." *Id.* ¶ 7 (quotation simplified).

¶35 Although the district court's discretion is broad, that discretion "must be exercised within the confines of the legal standards set by the appellate courts." *Schindler v. Schindler*, 776 P.2d 84, 87 (Utah Ct. App. 1989). In addition, the "facts and reasons for the court's decision must be set forth in appropriate findings of fact and conclusions of law." *Id.* "The district court's factual findings are adequate only if they are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Lay*, 2018 UT App 137, ¶ 19 (quotation simplified). Without sufficient detail and clarity, appellate courts cannot "ensure that the district court's discretionary determination was rationally based," *Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882, and ensure that "the parties are informed of the district

court's reasoning," *Lay*, 2018 UT App 137, ¶ 19 (quotation simplified).

¶36   Here, the district court found Father had shown "a significant change in circumstances that warrant[ed] a modification of parent-time . . . based on the . . . finding of child abuse of [Child] by [Mother]." The court's finding was supported with detailed, subsidiary findings of fact, including that the DCFS Finding was credible, well-documented, and confirmed by Child.[2] In addition, the district court found Mother made "multiple violent outbursts in the presence of or directed at Child," and Child used marijuana at Mother's house during a supervised visit. "[B]ased on [Mother's] abusive behavior," the district court found "that [Child] is suffering from post-traumatic stress disorder . . . and that [Child's] relationship with [Mother] is strained."

¶37   The district court then began the second step to determine which parent-time arrangement would serve Child's best interest. To that end, the court modified parent-time by ordering

---

2. We note that Mother appealed the DCFS Finding during this appeal, and we were informed by Mother's counsel that it was changed from "supported" to "unsupported." An unsupported finding means "there is insufficient evidence to conclude that abuse . . . occurred." Utah Code Ann. § 62A-4a-101(45) (LexisNexis Supp. 2018). But an unsupported finding does not mean "that [DCFS] . . . conclude[d] that the allegation was without merit." *Id.* "Without merit" is a separate designation that means DCFS determined "the alleged abuse . . . did not occur." *Id.* § 62A-4a-101(46). On remand, "the decision whether to take additional evidence" regarding the parent-time order "is within the sound discretion of the [district] court." *Interiors Contracting, Inc. v. Smith, Halander & Smith Assocs.*, 881 P.2d 929, 931 (Utah Ct. App. 1994) (quotation simplified).

the immediate adoption of the six-week step-up plan. But the court found that it remained in Child's best interest that Mother retain parent-time as set forth in the original decree, following successful completion of the step-up plan.

¶38 We are unable to properly review the district court's parent-time modification because its findings regarding parent-time did not contain sufficient detail to explain the "steps by which the ultimate conclusion" was reached. *See Lay*, 2018 UT App 137, ¶ 19 (quotation simplified). The only findings to support a return to Mother's original parent-time after completion of the six-week step-up plan were that the relationship between Mother and Child had "improved through counseling and due to the restrictions that [had] been in place since the temporary orders were entered," and that the court "found credible" the therapists' opinions "that a step-up and reunification plan are in the best interest of [Child]."

¶39 As to the therapists' opinions, the district court's finding was that the therapists supported "a" step-up plan, not "the" step-up plan. As Father notes, Child's personal therapist recommended a longer period for reunification and a "step-down" schedule, basing that recommendation on the lack of progress Child felt had taken place in therapy. The court did not explain why it deemed the reunification therapist's recommendation of a six-week step-up plan was more appropriate than the the personal therapist's recommendation regarding a longer period of time for further reunification therapy before Mother regained her parent-time. The court may have reached that conclusion because it found the reunification therapist's testimony more credible than Child's personal therapist's testimony. But the court "did not provide any such explanation." *See id.* ¶ 28.

¶40 Further, compelling evidence in the record supports a contrary conclusion regarding Mother and Child's relationship.

Child stated she was "'afraid' of [Mother], and [did] not feel [Mother] [had] the capacity to change or learn anything from therapy." Through the GAL, Child told the district court she would be "in fear for her safety" if she slept at Mother's house.

¶41    Child's personal therapist reported that the relationship between Mother and Child had not improved. At the time of the personal therapist's recommendation, Mother and Child had completed only two months of reunification therapy and attended only eight sessions. Indeed, the record indicates that both therapists and the GAL expressed concerns about the uncertain results of the reunification therapy. Those concerns are highlighted by several statements, including "there hasn't been progress," "the work isn't complete," and "[I] am concerned by the actions of [Mother] and the effect of her actions on [Child]."

¶42    "A [district] court's failure to provide adequate findings is reversible error when the facts are not clear from the record." *Bartlett v. Bartlett*, 2015 UT App 2, ¶ 2, 342 P.3d 296 (quotation simplified). That is the case here. The district court's findings of fact do not "show that the court's judgment . . . follows logically from, and is supported by, the evidence." *Id.* (quotation simplified). Given the court's finding of "significant change warranting modification of parent-time," it was required to state adequate findings to ensure there was a rational basis to support its decision to allow Mother to return to her extended, overnight parent-time after just six weeks. *See Lay*, 2018 UT App 137, ¶ 19. The district court's findings are therefore insufficient.

¶43    We agree with Father's argument that "jump[ing] from establishing that there has been a significant change of circumstances that warrants modification, to then stating that . . . the relationship between [Mother] and [Child] [had] improved through counseling" renders the conclusion regarding parent-time "not entirely clear." Considering the court's findings of abuse, and the conflicting evidence regarding the appropriate

restrictions and conditions to Mother's parent-time, it is not "reasonable to assume that the [district] court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882 (quotation simplified); *see also Hall v. Hall*, 858 P.2d 1018, 1025 (Utah Ct. App. 1993) (determining that "missing findings can be viewed as harmless error" where "the undisputed evidence clearly establishes the factor or factors on which findings are missing," or where "the absent findings can reasonably be implied" (quotation simplified)).

¶44 In sum, the district court's findings were "inadequate to disclose the steps by which the court reached its ultimate conclusion" that Mother's relationship with Child had improved, making the six-week step-up plan in Child's best interest. *See Lay*, 2018 UT App 137, ¶ 28. We thus remand to the district court to make additional findings with respect to whether the modified parent-time plan is in Child's best interest and to adjust its order as may be appropriate, given those findings.

CONCLUSION

¶45 We conclude the district court did not err in awarding sole physical custody to Father. We also conclude it did not err in using a sole physical custody worksheet to calculate Mother's child support obligation. But we conclude the district court did not provide adequate findings to support its ultimate parent-time award and therefore remand to the district court to make additional findings with respect to whether the modified parent-time plan is in Child's best interest. The court may, in its discretion, allow additional evidence with regard to parent-time. And with the additional findings made, the court shall adjust its order as may be appropriate.

_____