2021 UT App 58

# THE UTAH COURT OF APPEALS

BRUCE RAY MCFARLAND,
Appellant and Cross-appellee,

*v.*

NICOLE S. MCFARLAND,
Appellee and Cross-appellant.

Opinion
No. 20190541-CA
Filed June 4, 2021

Second District Court, Farmington Department
The Honorable David J. Williams
No. 084701533

Jacob K. Cowdin and A. Douglas Anderson,
Attorneys for Appellant and Cross-appellee

Angilee K. Dakic and Ryan C. Gregerson Attorneys
for Appellee and Cross-appellant

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DAVID N. MORTENSEN
concurred.

HARRIS, Judge:

¶1      Bruce Ray McFarland (Bruce) and Nicole S. McFarland
(Nicole)[1] divorced in 2009 pursuant to a stipulated divorce
decree, but soon thereafter began to ignore many of the decree's
important provisions. However, neither party brought any
matter to the attention of the district court for some eight years,
until Bruce filed a petition to modify in 2017, and Nicole
followed up with a request that the court hold Bruce in

---

1. Because the parties share the same surname, for clarity we
identify them by their first names, with no disrespect intended.

contempt. Both parties now appeal the court's ruling on those requests and, for the reasons discussed herein, we affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND

*The Divorce Decree*

¶2      In 2008, after almost sixteen years of marriage, Bruce and Nicole separated, and Bruce filed a petition for divorce. Soon thereafter, the parties negotiated a resolution to the divorce proceedings, and filed papers memorializing their agreement. In February 2009, the court entered a decree of divorce (the Decree) that incorporated the parties' stipulated agreement. With regard to alimony and the house in which they lived while they were married (the Home), the parties' agreement was straightforward: Bruce was ordered to pay $1,700 per month in alimony to Nicole, beginning in November 2008 and continuing until Nicole "remarries, cohabits, dies, for a term equal to their marriage, or further order of the Court," and Nicole was awarded the Home, including the obligation to make the mortgage payments.

¶3      But the parties' agreement regarding custody and child support was unusual. Bruce was to have overnight custody of the parties' four children every week from Sunday evening until Friday morning, with the parties each enjoying weekend overnight custody on an alternating basis. During the modification proceedings at issue here, Nicole acknowledged that the arrangement entitled her to fewer than 30% of the overnights; indeed, the district court found that this arrangement resulted in Bruce having "24 overnights per month with the children," leaving Nicole with just six, and neither party takes issue with that finding. But despite the fact that Bruce was awarded more than 70% of the overnights, *see* Utah Code Ann. § 30-3-10.1(2)(a) (LexisNexis 2009) (defining "joint physical custody" as any arrangement in which "the child stays with each parent overnight for more than 30% of the year"), the parties

labeled their arrangement "joint . . . physical custody," perhaps because the arrangement contemplated that Nicole would pick the children up from school every day and care for them until eight o'clock p.m., at which point Bruce was to retrieve the children so that they could "stay with him overnight."

¶4     With regard to child support, the parties agreed to calculate the amount using the sole custody worksheet, even though they labeled their arrangement as joint custody, and agreed that Bruce—and not Nicole, notwithstanding the fact that Bruce had the lion's share of the overnights—would be considered the "Obligor Parent" on the worksheet. Using these parameters, the parties agreed that Bruce would pay Nicole monthly child support equating to one-half of what the worksheet said Bruce would owe if he were the Obligor Parent, an amount the parties computed to be $739.73 per month at the time the Decree was entered, when all four children were still minors.[2]

---

2. Divorcing parties have limited ability to make child support obligations the subject of a stipulated agreement. *See* Utah Code Ann. § 78B-12-201(4) (LexisNexis 2018) ("A stipulated amount for child support . . . is adequate under the guidelines if the stipulated child support amount . . . equals or exceeds the base child support award required by the guidelines."); *see also Baggs v. Anderson*, 528 P.2d 141, 143 (Utah 1974) (stating that a child's right to receive child support is his or her own and "is not subject to being bartered away" by the litigating parents); *Price v. Price*, 289 P.2d 1044, 1044 (Utah 1955) ("Future child support effectively cannot be the subject of bargain and sale."). Because no party asks us to do so, we do not reach the question of whether it was appropriate for the district court, at the time the Decree was entered, to approve this particular child support arrangement.

*Post-Divorce Events and Conduct*

¶5      Soon after the court entered the Decree, both parties began to ignore many of its provisions. For instance, Nicole made no mortgage payments on the Home. And Bruce made only one alimony payment (in January 2009) and three child support payments (in December 2008, and January and February 2009), but after that made no payments of either kind.

¶6      In addition, with Nicole's permission, Bruce moved back into the Home in April 2009. After that point, although Bruce made no payments denominated as alimony or child support, he did resume paying the mortgage on the Home, a payment that happened to be $1,728 per month, only slightly more than Bruce's alimony obligation. When Bruce first moved back in, he and Nicole lived separately for a time, but beginning in September 2009, and lasting until April 2010, Bruce and Nicole resumed cohabiting as a couple, which included sharing familial expenses and reinitiating sexual relations. It is not a matter of dispute in this case that, during that seven-month period, the parties were cohabiting, as that term is used in relevant statutes and case law. *See Myers v. Myers*, 2011 UT 65, ¶ 17, 266 P.3d 806 (identifying the "hallmarks of cohabitation, including participation in a relatively permanent sexual relationship akin to that generally existing between husband and wife and the sharing of the financial obligations surrounding the maintenance of the household" (quotation simplified)); *see generally* Utah Code Ann. § 30-3-5(10) (LexisNexis 2017) (stating that alimony "terminates upon establishment by the party paying alimony that the former spouse is cohabitating with another person").

¶7      In April 2010, Nicole enlisted in the military, and left Utah for basic training. Over the next seven years, Bruce resided in the Home with the children, and provided all necessary childcare and financial support, including making the monthly mortgage payments on the Home. Nicole served two tours of duty overseas with the military, and visited the children or took them on vacation periodically while on leave. But other than these

short visits, Nicole exercised no custody or parent-time, and provided no significant financial support to the children. Eventually, in 2015, Nicole remarried.

¶8      For the seven years following Nicole's enlistment, both parties seemed content with their arrangement and, even though both were materially violating the terms of the Decree, neither filed so much as a single document with the court. In particular, neither party sought to modify the terms of the Decree, and neither party sought contempt sanctions against the other.

*The Post-Divorce Filings*

¶9      The parties' tacit arrangement came to an end in 2017 when Bruce sought to refinance the Home. Because Nicole had been awarded the Home in the Decree, Bruce asked Nicole to deed him the Home to facilitate the refinance. Nicole refused to authorize the refinance unless Bruce paid her half the equity, asserting that she owned the Home and that any mortgage payments made by Bruce constituted "either rent or alimony payments" that he owed her. Then, in June 2017, Bruce filed a petition to modify, followed by a motion for temporary orders in February 2018, bringing three separate provisions of the Decree to the court's attention. First, Bruce requested that alimony be terminated, dating back to 2009. Second, Bruce asked the court to modify the Decree to award him sole physical and legal custody of the two remaining minor children, and asked that he be awarded child support payments from Nicole going forward. And finally, Bruce asked the court to modify the Decree to award him the Home, alleging that he assumed the mortgage to avoid foreclosure because Nicole had "abandoned the property when she joined the military." While the petition and motion for temporary orders were pending, Bruce completed a refinance of the Home, apparently finding a way to close the transaction without Nicole's authorization.

¶10      Nicole responded by filing two orders to show cause, asking the court to hold Bruce in contempt in three respects:

(1) for failing to make alimony payments; (2) for failing to make child support payments; and (3) for occupying the Home and for refinancing it without her authorization. Nicole asked the court to enter judgment in her favor for alimony and child support arrears, as well as for "the amount that [Bruce] cashed out when he refinanced" the Home, and asked the court to order that she obtain immediate "use and possession" of the Home.

¶11   After a hearing, a domestic relations commissioner certified a number of issues as ripe for an evidentiary hearing before the district court, including the following: (1) whether Bruce should be held in contempt for failing to pay alimony and, if so, the amount of arrears at issue; (2) whether Bruce should be held in contempt for failing to pay child support and, if so, the amount of arrears at issue; (3) whether Bruce should be held in contempt for refinancing the Home without Nicole's consent; and (4) whether Bruce should be held in contempt for occupying and refusing to vacate the Home. All of the issues certified by the commissioner were framed as contempt or temporary order issues; the commissioner apparently did not envision that the hearing would be a final dispositive hearing on Bruce's petition to modify.

¶12   In anticipation of the evidentiary hearing before the district court, both parties filed papers outlining their positions. Citing section 30-3-5(10) of the then-applicable Utah Code, Bruce argued that he did not owe any alimony arrears because his obligation to pay alimony terminated in 2009 due to "the cohabitation relationship" that the two established when they moved back into the Home together. Citing *Scott v. Scott*, 2017 UT 66, ¶¶ 10, 26–27, 26 n.7, 423 P.3d 1275, Nicole argued in response that, under the applicable statute as interpreted by our supreme court, a party attempting to terminate alimony for cohabitation must file a motion or petition "during [the] alleged co-habitation."

¶13   Regarding child support, Bruce asserted that he should not be required to pay Nicole for any point after 2009, because

the children had been almost entirely in his care since then. In particular, Bruce argued for the applicability of section 78B-12-108 of the Utah Code, which provides that child support payments generally "follow the child," and that changes in child support obligations can, under certain circumstances, occur "without the need to modify" the governing decree. *See* Utah Code Ann. § 78B-12-108(1), (2) (LexisNexis 2017). Bruce's arguments in the pretrial briefing were entirely defensive—that is, he asserted that he should not be required to make child support payments to Nicole after 2009, but at no point did he assert an entitlement to child support arrears from Nicole regarding any time period prior to the filing of his petition to modify.

*The Hearing and Subsequent Ruling*

¶14    At the ensuing evidentiary hearing, the court heard live testimony from Bruce, Nicole, Bruce's father, and the parties' adult daughter. At the conclusion of the evidence, the court took the matter under advisement, and asked the parties to submit written closing arguments in the form of post-trial briefs.

¶15    In her closing brief, Nicole attempted to rebut Bruce's cohabitation claim with two arguments. First, Nicole asserted that the governing statute, as interpreted in *Scott*, required Bruce to have requested termination of alimony during the period of cohabitation. Second, Nicole argued that, even if Bruce's request was timely, no cohabitation occurred because Bruce, the payor spouse, did not qualify as "another person" within the meaning of the governing statute. *See* Utah Code Ann. § 30-3-5(10) (LexisNexis 2017) (stating that alimony terminates if "the former spouse is cohabitating with another person"). For his part, while he attempted to rebut all of Nicole's claims, Bruce again made no affirmative claim to child support arrears running in his direction.

¶16    A few weeks later, the court issued a written ruling. With regard to alimony, the court found Bruce in contempt for failing

to make payments. First, the court concluded that the mortgage payments Bruce made were just that—mortgage payments on a house Bruce lived in—and could not be considered alimony, and it found that Bruce had not paid any alimony since 2009. Second, the court determined that, even if all of the hallmarks of cohabitation were present between September 2009 and April 2010, cohabitation had not occurred because "'cohabitation' does not include meeting the elements of cohabitation with the ex-spouse." Accordingly, the court concluded that Bruce's alimony obligation had not terminated in 2009 when the parties moved back in together, and that Bruce was in contempt for not paying alimony between 2009 and Nicole's remarriage in 2015. Based on those findings, the court computed the alimony arrearage amount to be "$150,744.50 plus post-judgment interest," and ordered Bruce to pay that amount.

¶17 With regard to child support, the court found that Bruce was not in contempt. The court accepted Bruce's argument that, pursuant to section 78B-12-108 of the Utah Code, the child support obligation was to follow the children, and concluded that, pursuant to subsection (2) of that statute, which the court found applicable, Bruce was relieved of his child support obligation dating back to 2009, even though he did not file a petition to modify until 2017. In addition, the court offered its view that, even if section 78B-12-108 were inapplicable, "it would not be equitable to require" Bruce to pay child support to Nicole for time periods in which he cared for the children. On those bases, the court determined that Bruce had no obligation to pay child support to Nicole after 2009. But the court did "not find that [Nicole] was required to pay child support payments to [Bruce] after leaving for military service," noting that, in its view, Bruce had not made any such affirmative claim, and instead had raised only defensive claims regarding any obligations he might have to Nicole.

¶18 With regard to the Home, the court declined to find Bruce in contempt for not vacating the Home, refusing to quitclaim it to Nicole, or refinancing it. However, the court made no ruling

on altering the Decree's provision that originally awarded the Home to Nicole, stating simply that Bruce "shall be allowed, on a temporary basis, to remain" in the Home "until the matter is brought forth and certified" by the commissioner as ripe for an evidentiary hearing.

ISSUES AND STANDARDS OF REVIEW

¶19 Both parties appeal the district court's ruling, raising two main issues for our review. First, Bruce challenges the court's determination that his alimony obligation was not terminated by cohabitation. In advancing this argument, Bruce relies entirely on Utah's alimony statute, and asserts that the court's interpretation of that statute was incorrect. *See* Utah Code Ann. § 30-3-5(10) (LexisNexis 2017) (stating that a payor spouse's obligation "terminates upon establishment by the party paying alimony that the former spouse is cohabiting with another person").[3] "The proper interpretation and application of a statute

---

3. The Decree contains slightly different language than the alimony statute; it states that the alimony obligation continues until Nicole "remarries, cohabits, dies, for a term equal to their marriage, or further order of the Court." Thus, unlike the statute, the operative language of the Decree contains no language requiring that the payor spouse prove that the payee spouse "is cohabitating" at the time of the petition to modify, and contains no language specifying that cohabitation, in order to terminate alimony, must be "with another person." *See* Utah Code Ann. § 30-3-5(10) (LexisNexis 2017). But no party argues that the language of the Decree mandates a different result than the language of the statute; rather, in making their arguments about alimony, both parties rely exclusively on the statute. As our supreme court has done under similar circumstances, we limit our analysis to the language of the alimony statute. *See Scott v. Scott*, 2017 UT 66, ¶¶ 3 n.1, 21 n.5, 423 P.3d 1275 (stating that, because "neither party argues . . . that [the court] should decide

(continued…)

is a question of law which we review for correctness . . . ." *Veysey v. Veysey*, 2014 UT App 264, ¶ 7, 339 P.3d 131 (quotation simplified).

¶20   Next, both parties challenge the court's child support rulings. Nicole takes issue with the court's determination that Bruce did not owe her child support payments, pursuant to the terms of the Decree, after 2009. And Bruce asserts that the court erred by declining to order Nicole to pay child support arrears to him. Because the parties' arguments center on interpretation and application of section 78B-12-108 of the Utah Code (Section 108), we review the district court's decision for correctness. *See Veysey*, 2014 UT App 264, ¶ 7.[4]

---

(…continued)
this case under the language of the divorce decree or that the decree's language demands a different result," the court would "limit [its] analysis to the parties' arguments and [would] not consider the decree's language").

4. In addition, Nicole argues that the court erred by "failing to enter requisite findings for final disposition" of the Home. But final disposition of the Home was not an issue certified for adjudication at the evidentiary hearing, so it is not surprising that the court did not issue a final decision on that matter. In general, a district court is allowed "considerable discretion to administer the business of its docket and determine how a trial should be conducted." *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1244 (Utah 1998) (quotation simplified). The commissioner certified issues regarding whether Bruce should be held in contempt for occupying the Home, refusing to deed it to Nicole, and refinancing it, as well as issues relating to "occupancy" of the Home, as raised in Bruce's motion for *temporary* orders. But neither the commissioner nor the court viewed the evidentiary hearing as the final trial on Bruce's petition to modify; indeed, the court clearly used language in its conclusions of law

(continued…)

ANALYSIS

I. Alimony

¶21    We first address Bruce's claim that his alimony obligation terminated by operation of statute when the parties cohabited in 2009 and 2010. Because Bruce's position is directly foreclosed by our supreme court's decision in *Scott v. Scott*, 2017 UT 66, 423 P.3d 1275, we reject his challenge to the district court's ruling.

¶22    At all relevant times during the events precipitating this appeal, Utah's alimony statute provided that alimony obligations "to a former spouse terminate[] upon establishment by the party paying alimony that the former spouse *is cohabiting* with another person." Utah Code Ann. § 30-3-5(10) (LexisNexis 2017) (emphasis added).[5] In *Scott*, our supreme court

---

(…continued)
indicating that it contemplated further proceedings regarding whether to modify the Decree's provision regarding the Home. We anticipate that, on remand, the court will address in some fashion the remaining issues raised in Bruce's petition to modify, including this one. Nothing in this opinion should be construed as preventing the parties from asking the district court to adjudicate those issues in due course.

5. The same version of the relevant subsection of the alimony statute quoted above was in effect when the Decree was entered in 2009, *see* Utah Code Ann. § 30-3-5(10) (LexisNexis 2009), when the parties ceased cohabiting in 2010, *see id.* (2010), and when Bruce filed his petition to modify the alimony provision of the Decree in 2017, *see id.* (2017). At oral argument before this court, both parties agreed that this version of the alimony statute is applicable here. In the wake of the *Scott* ruling from our supreme court, however, the legislature amended the alimony statute. *See id.* § 30-3-5(10)–(12) (Supp. 2018). As it presently reads, the statute allows a payor spouse to file a valid petition to modify

(continued…)

was asked to interpret the same version of this statute. *See* 2017 UT 66, ¶ 3. After noting the statute's use of present tense language—"is cohabitating"—the court interpreted the statute as requiring "the paying spouse to establish that the former spouse *is* cohabiting at the time the paying spouse files the motion to terminate alimony." *See id.* ¶¶ 23, 33. While the *Scott* opinion was not published until 2017, the statutory language the court was interpreting in that case had been in effect at all times relevant to this case. *See supra* note 5. That is, *Scott* did not introduce a new rule that was effective only prospectively; rather, it provided an interpretation of statutory text that had already been in effect for several years. *See DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 56 (2015) ("[J]udicial construction of a statute ordinarily applies retroactively."); *see also Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311–12 (1994) (stating that "the principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student" (quotation simplified)).

¶23 Under the circumstances presented in this case, any cohabitation between Bruce and Nicole ceased sometime in early 2010. But Bruce did not file his petition to modify until 2017. It is therefore undisputed that the cohabitation to which Bruce points had long since ceased by the time he filed his petition to modify. Thus, under the statute then in effect (as interpreted by *Scott*),

---

(…continued)

alimony for cohabitation within "one year from the day on which the party knew or should have known that the former spouse has cohabited with another individual." *Id.* § 30-3-5(12)(b) (2019). The payor spouse no longer needs to file the petition while the former spouse is presently cohabiting, so long as the petition is filed within one year of notice. *Id.* § 30-3-5(12)(a)–(b). Both parties in this case agree that, under the current statute, if it applied, Bruce's petition would be considered untimely, because Bruce did not file it within one year of learning of Nicole's cohabitation.

that petition was filed some seven years too late. Accordingly, Bruce cannot now complain that his alimony obligation should be terminated, by operation of statute, due to the parties' long-since-concluded cohabitation. Bruce has therefore not carried his burden of demonstrating error in the district court's ruling that Bruce's alimony obligation lasted until Nicole's 2015 remarriage,[6] or in the court's rulings holding Bruce in contempt for failing to pay alimony from 2009 through 2015 and ordering him to pay past-due alimony.[7]

---

6. Neither party disputes that Nicole's remarriage terminated Bruce's alimony obligation. *See* Utah Code Ann. § 30-3-5(9) (LexisNexis 2017) (providing that the obligation to pay "alimony to a former spouse automatically terminates upon the remarriage . . . of that former spouse").

7. Because Bruce's argument is foreclosed by *Scott*, we need not reach Nicole's other argument, adopted by the district court, that no cohabitation occurred because Nicole cohabited with Bruce—the payor spouse—as opposed to someone else. Under the applicable version of the alimony statute, alimony terminates when the payor spouse demonstrates that the payee spouse "is cohabitating with *another person*." *See* Utah Code Ann. § 30-3-5(10) (LexisNexis 2017) (emphasis added). In Nicole's view, Bruce—as the payor spouse—does not count as "another person." The district court accepted that argument, based in part on case law from another jurisdiction. *See In re Marriage of Antonich*, 499 N.E.2d 654, 656 (Ill. App. Ct. 1986). We have our doubts about the applicability of the holding of that case to Utah's alimony statute, and about the correctness of the district court's ruling predicated upon it. *Compare id*. (suggesting that "[t]he proper interpretation of a statute cannot always be based on its language alone; it must be grounded on the nature, object, and consequences that would result from construing it one way or another"), *with Scott*, 2017 UT 66, ¶ 26 (recognizing that courts must "start from the premise that we should discern what the

(continued…)

## II. Child Support

¶24   Next, we address the parties' respective challenges to the district court's child support rulings. As noted, Nicole takes issue with the court's ruling that Bruce's child support obligations to her, as set forth in the Decree, ended in 2009, and that therefore Bruce could not be held in contempt for not meeting those obligations. Building on that same ruling, Bruce takes issue with the court's reluctance to go a step further and order Nicole to pay him child support arrearages dating to 2009. We begin our analysis by discussing some of the broad overarching principles governing modification of child support orders, including a discussion of Section 108 in particular. We then address the parties' respective challenges, in turn, beginning with Nicole's.

### A

¶25   In general, decrees in domestic relations cases are binding final judgments that may be modified "only under certain conditions." *Kielkowski v. Kielkowski*, 2015 UT App 59, ¶ 21, 346 P.3d 690; *see also Robertson v. Stevens*, 2020 UT App 29, ¶¶ 6–7, 461 P.3d 323 (explaining that once "judgment is entered" in a divorce case, "the court's power to modify the judgment is limited" (quotation simplified)). While there are several tools that can generally be used to modify final judgments, *see, e.g.,*

---

(…continued)

legislature intended from the plain language of the text unencumbered by notions of what we think the legislature must have wanted to accomplish"). At least at first blush, the plain meaning of "another person" would seem to include the payor spouse. However, we need not reach a conclusive ruling on this point because we can readily affirm the district court's ruling on another ground—the timeliness ground made clear in *Scott*, as discussed *supra* ¶¶ 21–23—that is apparent from the record. *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158.

Utah R. Civ. P. 60(b), one tool that is specific to family law cases is the petition to modify, *see id.* R. 106(a) (stating that, in most cases, "proceedings to modify a divorce decree . . . shall be commenced by filing a petition to modify"); *see also Ross v. Ross*, 2019 UT App 104, ¶ 11, 447 P.3d 104 ("[R]ule 106 establishes a general rule . . . that any changes to divorce decrees must be brought about by the filing of a petition to modify."). Parties in family law cases may use this tool, in accordance with applicable statutes and rules, to seek modification of various provisions of decrees, including child support provisions. *See* Utah Code Ann. § 78B-12-210(9)(a) (LexisNexis 2017) ("A parent . . . may at any time petition the court to adjust the amount of a child support order if there has been a substantial change in circumstances."); *see also id.* § 30-3-5(3) ("The court has continuing jurisdiction to make subsequent changes or new orders for the custody of a child and the child's support, maintenance, health, and dental care, and for distribution of the property and obligations for debts as is reasonable and necessary."); *id.* § 30-3-5(8)(i)(i) ("The court has continuing jurisdiction to make substantive changes and new orders regarding alimony based on a substantial material change in circumstances . . . .").

¶26　But in general, modifications to a decree's provisions regarding child support payments may date back only to "the month following service" of the petition to modify "on the parent whose support is affected." *See id.* § 78B-12-112(4); *see also McPherson v. McPherson*, 2011 UT App 382, ¶ 17, 265 P.3d 839 (stating that "the statute does limit the time period during which retroactive modification is available"). That is, as concerns child support provisions, parties are generally barred from obtaining modifications that date back further than the first day of the month after the month in which the petition to modify was served on the opposing party.

¶27　One potential exception to this general rule appears in Section 108, a statutory provision entitled "Support Follows the Child." *See* Utah Code Ann. § 78B-12-108 (LexisNexis 2017). That section, in relevant part, reads as follows:

> (1) Obligations ordered for child support and medical expenses are for the use and benefit of the child and shall follow the child.
>
> (2) *Except in cases of joint physical custody* and split custody as defined in Section 78B-12-102, *when physical custody changes* from that assumed in the original order, the parent without physical custody of a child shall be required to pay the amount of support determined in accordance with [calculation guidelines found in other code sections] *without the need to modify the order* for . . . the parent who has physical custody of the child.

*Id.* (emphasis added). Thus, Section 108 contains an overarching mandate that child support payments "shall follow the child," and provides that, under certain limited circumstances, child support obligations can change "without the need to modify" the child support provisions in the governing decree. *Id.*; *see also Hansen v. Hansen*, 2012 UT 9, ¶ 13, 270 P.3d 531 (stating that, under certain circumstances, Section 108 "allows redirection of child support [payments] without modification of the support order"). In this way, Section 108 constitutes an exception to the general rule that modifications to child support provisions may date back only to the month following service of the petition to modify on the opposing party: where Section 108 applies, it may allow modification of child support awards even further back in time.

¶28 But this exception comes with distinct statutory limits. Indeed, our supreme court has noted that Section 108 "contains two provisions: (1) a general statement that support shall follow the child and (2) a specific provision providing guidelines for redirection of child support to a new physical custodian." *Hansen*, 2012 UT 9, ¶ 7. And the court has already foreclosed any argument that subsection (1)'s general statement—that child

support "shall follow the child"—operates by itself "to redirect support payments any time anyone provides any shelter or sustenance to a child." *See id.* ¶ 10. Instead, the specific requirements of subsection (2) operate to "modif[y] the general statement in subsection (1)," and those specific requirements serve as the prerequisites for entitlement to a retroactive change in child support that dates back further than the date of a duly served petition to modify. *See id.* ¶ 11.

¶29    Under the provisions of subsection (2), a litigant can obtain a change in a child support provision even "without the need to modify the order" itself, but only if two conditions are met: (a) there must be a change in "physical custody . . . from that assumed in the original order," and (b) the case must not be one involving "joint physical custody." *See* Utah Code Ann. § 78B-12-108(2).

B

¶30    Bruce asserts that Section 108 applies here, and allows him to obtain retroactive modification, dating all the way back to 2009, of the Decree's child support provisions, even though he did not seek modification of either the custody provisions or the child support provisions until 2017. The district court agreed with Bruce's interpretation of Section 108, and determined that Bruce was not in contempt for failure to pay Nicole child support between 2009 and 2017 because he had been caring for the children during that time and because child support should "follow the children." (Citing Utah Code Ann. § 78B-12-108.)

¶31    Nicole challenges the court's interpretation of Section 108. We agree with Nicole because, for two independent reasons, Section 108 is inapplicable here. First, this is not a case in which physical custody ever legally changed "from that assumed in the original order." *See* Utah Code Ann. § 78B-12-108(2) (LexisNexis 2017). And second, even assuming that some sort of de facto change of parent-time occurred in 2010 when Nicole joined the military, that change did not constitute a change in physical

custody under the operative definition of that term. *See id.* §§ 30-3-10.1(3)(a), 78B-12-102(15) (each defining "joint physical custody" for its respective chapter).

1

¶32    In order for Section 108's exception to apply, the situation must involve a change in "physical custody . . . from that assumed in the original order." *See id.* § 78B-12-108(2). The term "physical custody," as used in this statute, is a "legal term of art" that "involve[s] much more than actual possession and care of a child." *See Hansen*, 2012 UT 9, ¶¶ 12, 15, 19. "A physical custodian also has a *legal* responsibility to provide supervision and control." *Id.* ¶ 15 (emphasis added).

¶33    Given this definition, a change in "physical custody" cannot occur without some sort of "formal legal process[]." *Id.* ¶¶ 19, 24. In most cases, this occurs by court order following the filing of a petition to modify. *See id.* ¶¶ 21, 25. In other "rare circumstances," this can occur "by statute without the need for a hearing or court order." *Id.* ¶ 25. But in any event,

> child support should be redirected only to those persons or entities who acquire the rights and responsibilities of the child's new "physical custodian" under the law. Usually that will happen only after adjudication and a formal order, but in all cases it requires fulfillment of the statutory procedures and standards for a change in physical custody. The actual provision of sustenance and support is insufficient.

*Id.*

¶34    In this case, no one disputes that Bruce assumed all responsibility for "sustenance and support" of the children after April 2010. *See id.* But in this context, provision of additional sustenance and support to the children beyond that anticipated

in the Decree is not enough to effectuate an actual, *legal* change in physical custody. *See id.* Bruce took no steps—at least not until 2017—to follow the "formal legal processes" typically used to effectuate an actual change of physical custody. *See id.* ¶ 24. And Bruce makes no argument that this case presents any "rare circumstances" in which custody can change by operation of statute, even in the absence of a petition to modify. *See id.*

¶35    Thus, no change in "physical custody"—in an actual legal sense, as required by the "term of art" definition of the statutory phrase, *see id.* ¶ 12 (quotation simplified)—occurred in April 2010, or at any time prior to the filing of Bruce's petition to modify. Because physical custody did not change, Section 108's narrow exception to the usual retroactivity rules governing modification of child support orders does not apply here, and therefore it does not enable Bruce to seek changes to the Decree's child support obligations dating any further back than 2017.

2

¶36    Moreover, even if we were to assume, for purposes of argument, that a change in "physical custody" could theoretically be effectuated merely by a parent's provision of additional sustenance and support beyond that required by the governing child support order, no such change occurred on the facts of this case. We have previously stated that "[c]ustody and parent-time are conceptually distinct." *See Ross v. Ross*, 2019 UT App 104, ¶ 14 n.3, 447 P.3d 104. By statutory definition, there are two kinds of physical custody—sole physical custody and joint physical custody—with the dividing line based on the number of overnight visits enjoyed by each parent. *See* Utah Code Ann. §§ 30-3-10.1(3)(a), 78B-12-102(15) (both stating that "joint physical custody means the child stays with each parent overnight for more than 30% of the year, and both parents contribute to the expenses of the child in addition to paying child support" (quotation simplified)). Because either parent, in any given case, could be awarded sole physical custody—defined as having at least 70% of the overnights—there are three

possible physical custody arrangements: (a) Parent 1 has sole custody; (b) Parent 2 has sole custody; and (c) the parents share joint custody. When a change occurs that causes one parent to obtain enough additional overnights to move from one category to another (e.g., from 25% of overnights to 35%, or from 65% to 75%), there has been a change in physical custody. *See Ross*, 2019 UT App 104, ¶¶ 16–17, 17 n.5. But when a change occurs in which one parent obtains a few additional overnights but not enough to move from one category to another, the change constitutes only a change in parent-time, and not a change in physical custody, as that term is statutorily defined. *See id.* ¶ 16 (noting that, in relocation cases, a parent need not file a petition to modify if scheduling changes necessitated by the proposed relocation would not change the statutory custody designation, and would change only parent-time).

¶37 In this case, the parties started out with an arrangement, under the Decree, in which Bruce had twenty-four overnights each month and Nicole had only six. Although the parties described that arrangement, in the Decree, as a joint custody arrangement, the label the parties assigned to the arrangement is inconsequential. *See Stephens v. Stephens*, 2018 UT App 196, ¶ 29, 437 P.3d 445 (stating that the "designation of 'joint physical custody' or 'sole physical custody'" used in a decree "is not as important as whether the custody arrangement [actually] exceeds the statutory threshold for joint physical custody" (quotation simplified)). And here, despite the parties' label, their arrangement was actually a sole custody arrangement. *See* Utah Code Ann. § 78B-12-102(15). As noted, the district court made a specific (and unchallenged) finding on this point, and correctly concluded that, because the Decree awarded Nicole only "approximately 20% of the overnights," it described a sole custody arrangement.

¶38 Thus, the more recent arrangement, following Nicole's departure into the military, did not result in a change of custody. After Nicole left, Bruce went from about 80% of the overnights to nearly 100% of the overnights. Thus, Bruce had sole physical

custody of the children under the original arrangement, and he maintained sole physical custody of the children after Nicole left. *See id.* In this situation, while Nicole's departure did result in practical (if not official) changes to the parties' division of *parent-time*, it did not effectuate any change in *physical custody*, under the statutory definition of that term.

¶39    Section 108 applies only in instances where "physical custody changes." *See id.* § 78B-12-108(2). For both of the reasons just discussed, no change in physical custody occurred here, and therefore Section 108 cannot provide Bruce an escape from the usual rule that modifications to a domestic decree's child support provisions cannot date back any further than the month following service of the petition to modify. *See id.* § 78B-12-112(4). We therefore sustain Nicole's challenge to the district court's interpretation of the relevant statutes.

3

¶40    The district court's ruling also included an alternative basis for declining Nicole's request that Bruce pay child support arrearages. Specifically, the court stated as follows:

> Finally, and regardless [of] whether [Section 108] applies here, it would not be equitable to require [Bruce] to pay child support arrearages to [Nicole] in this case. Even if that statute does not apply directly, subsection (1) is instructive of the legislature's intent that child support "is for the use and benefit of the children." . . . It would not be equitable to acknowledge that [Bruce] was the sole provider after moving back into the [Home] and especially after [Nicole] entered the military, acknowledge that [Nicole] provided very little, if any, support to the children since that time, but nonetheless require [Bruce] to pay the alleged child support arrearages requested by [Nicole].

¶41 We do not necessarily disagree with the court's sentiment (although we note that, in a big-picture sense at least, there are equities on the other side of the equation too: we can see wisdom in a bright-line rule requiring parties to file petitions to modify child support provisions, and in limiting parties' ability to obtain changes to decrees that date back any further than the month following service of the relevant petition to modify). Looking just at the facts of this case, there does seem to be something intuitively inequitable about requiring Bruce to pay child support arrearages to Nicole. And we acknowledge that district courts are often given wide discretion to apply equitable principles in family law cases. *See Harmon v. Harmon*, 491 P.2d 231, 232 (Utah 1971) ("In order to carry out the important responsibility of safeguarding the interests and welfare of children, it has always been deemed that the courts have broad equitable powers.").

¶42 But our legislature has enacted a number of statutes that govern certain aspects of family law cases, and we are aware of no principle of law that allows courts to override statutes, in particular cases, simply out of generalized equitable concerns. *See Martin v. Kristensen*, 2021 UT 17, ¶ 53 (stating that courts have "no equitable power to override" statutory mandates due to generalized concerns of "public policy and equity"). At a minimum, the district court has not adequately explained how its equitable concerns, in this situation, allow it to supersede statutory mandates or interpretations of those statutes by our supreme court. For instance, the district court's reliance on subsection (1) of Section 108 as being "instructive of the legislature's intent" that child support obligations shall "follow the child[ren]" appears misplaced, given our supreme court's explanation, in *Hansen v. Hansen*, that "[s]ubsection (1)'s general directive cannot possibly be interpreted unqualifiedly . . . to redirect support payments any time anyone provides any shelter or sustenance to a child," and that subsection (1) is "modifie[d]" by the "specific limitation[s]" found in subsection (2). *See* 2012 UT 9, ¶¶ 10–11, 270 P.3d 531. And as we have noted, *supra* ¶¶ 30–39, the prerequisites of subsection (2) are not satisfied

here. Apart from the language in subsection (1), the court does not otherwise explain how generalized equitable considerations, no matter how weighty, can justify modification of a child support order back beyond the month following service of the petition to modify, given our legislature's clear directive that such orders may be modified "only from the date of service of the pleading on the obligee." *See* Utah Code Ann. § 78B-12-112(4).

¶43 We observe that there may well be specific doctrines of equity or discretion that could apply in this situation to temper Nicole's requests. Nicole presented her request in the context of an order to show cause seeking contempt, a legal doctrine that has its own elements and requirements, *see Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988) (setting forth the required showing for a contempt finding), in which courts are afforded discretion in selecting an appropriate sanction once contempt is found, *see* Utah Code Ann. § 78B-6-310(1) (LexisNexis 2018) (stating that, "[i]f the court finds the person is guilty of the contempt, the court *may* impose a fine" or other punishment (emphasis added)); *id.* § 78B-6-311(1) (stating that a court "*may* order" the contemnor to pay the aggrieved party "a sum of money sufficient to indemnify and satisfy the aggrieved party's costs and expenses" (emphasis added)). Alternatively, various equitable doctrines may apply in situations like this, depending on the circumstances. *See, e.g., Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939–40 (Utah 1993) (discussing the doctrine of waiver and its elements); *Veysey v. Veysey*, 2014 UT App 264, ¶ 16, 339 P.3d 131 (discussing the doctrine of laches and its elements); *Bahr v. Imus*, 2009 UT App 155, ¶ 6, 211 P.3d 987 (discussing the doctrine of equitable estoppel and its elements). We express no opinion as to the applicability of any such doctrine to the facts of this case. But the district court did not ground its child support ruling—that Bruce should not be required to make child support payments—in its post-contempt sentencing discretion or in any specific equitable doctrine; instead, as we interpret its order, it concluded that, due to unspecified equitable considerations, Bruce should be relieved

from any obligation to make payments in the first place. In our view, the court has not adequately explained how equitable considerations can override statutory commands in this case.

¶44 Accordingly, we reverse the district court's determination that Bruce was not "required to pay child support payments to [Nicole] after [Nicole left] for military service," and we remand the matter for further proceedings on Nicole's request that Bruce be held in contempt for failing to make child support payments.

C

¶45 Finally, given our conclusion regarding Nicole's challenge to the district court's child support ruling, we can readily dispose of Bruce's challenge to that same ruling. As an initial matter, we agree with the district court's conclusion that Bruce made no affirmative claim, before the district court, to any child support arrears dating back further than the service of his petition to modify. On that basis alone, the district court was justified in not awarding him any. But more substantively, for the reasons already explained, we find no merit in Bruce's argument that Section 108 operates to allow him to look all the way back to 2009 for modification of the Decree's child support provisions.

CONCLUSION

¶46 The district court correctly determined that Bruce's alimony obligation was not terminated—at least not under the alimony statute—by the parties' cohabitation in 2009 and 2010, because the statute required Bruce to file a petition seeking termination while the cohabitation was still occurring, and he did not do so. Accordingly, the district court did not err by holding Bruce in contempt for failing to pay alimony after 2009, and in ordering Bruce to pay past-due alimony through 2015, and we affirm those orders.

¶47    However, the district court erred in its interpretation of Section 108, and erred in concluding that Section 108 operated to relieve Bruce of his obligation, under the Decree, to continue to pay Nicole child support after 2010. In this case, neither Section 108, nor generalized equitable concerns, operates to relieve Bruce of that obligation, and neither allows Bruce to obtain a modification of his child support obligations dating back any further than the month following service of his petition to modify.    Accordingly,    we    reverse    the    district    court's determination to the contrary, and remand the case for further proceedings, consistent with this opinion, on Nicole's request for contempt relating to child support and on Bruce's petition to modify.

———————