**2023 UT App 144**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF R.G.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

G.G.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220635-CA
Filed November 24, 2023

Second District Juvenile Court, Ogden Department
The Honorable Tasha Williams
No. 1183589

Keith Andrew Fitzgerald, Attorney for Appellant

Sean D. Reyes and John M. Peterson,
Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

CHRISTIANSEN FORSTER, Judge:

¶1   G.G. (Father) appeals the juvenile court's order terminating his parental rights to R.G. (Child). Father argues the juvenile court erred in finding that termination of his parental rights was strictly necessary, because placement of Child with Father's sister in another state was an option. Because Father has not persuaded us that the court committed reversible error, we affirm its order terminating Father's parental rights.

BACKGROUND[1]

¶2 Child was born in January 2020. The following day, the Division of Child and Family Services (DCFS) received a referral indicating that Child's mother (Mother)[2] had tested positive for illegal substances both at the time of Child's birth and during her pregnancy. Thereafter, a DCFS caseworker put a safety plan in place and Child was allowed to leave the hospital and return home with Father and Mother.

¶3 Almost exactly one month later, the juvenile court held a pretrial shelter hearing, which Father did not attend. Following the hearing, the court entered an order removing Child from Father's and Mother's custody and placing Child in the temporary custody of DCFS. That same day, a DCFS caseworker (Caseworker) held a kinship meeting to discuss placement options for Child. Despite being informed of the meeting, neither Father nor Mother chose to attend. Nevertheless, Caseworker identified an in-state kinship placement with a foster family (Foster Family) that had previously adopted two of Child's biological half-siblings.

¶4 A verified petition for custody and legal guardianship was filed one day after the shelter hearing. A few days later, Mother told Caseworker that she wanted Child to be placed with Father's sister (Aunt), who lived in Georgia. Father made the same request.

---

1. "We recite the facts in the light most favorable to the juvenile court findings." *In re J.M.*, 2020 UT App 52, n.1, 463 P.3d 66 (quotation simplified).

2. Mother's parental rights to Child were terminated at the same time as Father's. *See In re R.G.*, 2023 UT App 114. Because this appeal does not concern Mother, we recount the facts that relate specifically to Father.

¶5 In March 2020, Father attended a pretrial hearing on the verified petition. Based on Father's admissions to the allegations in the petition, the juvenile court adjudicated Child neglected as to Father.[3] Child was placed in DCFS's custody, and the court set Child's permanency goal as reunification with a concurrent goal of adoption. The court ordered that reunification services be provided to Father and that Father comply with a child and family plan.

¶6 In May 2020, Caseworker contacted Aunt to begin the placement process provided by the Interstate Compact on the Placement of Children (the ICPC).[4] Caseworker explained that the next step was to fill out paperwork to send to the Utah state office. She noted that the time required to complete the paperwork would depend on how soon she could obtain the necessary documents, including Child's social security card and birth certificate. Because Caseworker did not have those documents for Child on file, she requested them from the parents and from the social security office.

¶7 For the remainder of 2020, the juvenile court held periodic review hearings as required by statute. At the first hearing in June,

---

3. Father appealed the juvenile court's neglect adjudication. This court reversed and remanded the matter for further proceedings. On remand, the State filed an amended verified petition for custody and legal guardianship alleging that Child was dependent as to Father. Thereafter, the juvenile court adjudicated Child dependent as to Father. The other aspects of the court's original ruling—including Child's permanency goals—remained the same.

4. The ICPC is an interstate agreement that has been adopted by all fifty states. *See* Utah Code § 80-2-905. The ICPC allows child welfare agencies from different states to more easily cooperate regarding placement of children across state lines.

the court ordered DCFS "to move forward with the ICPC." At a hearing in August, the State informed the court that "the ICPC has been put on hold due to [DCFS] not having a social security number, or birth certificate for [Child]."

¶8    After multiple failed attempts to obtain Child's social security card and birth certificate from the parents, Caseworker was finally able to obtain the documents from the social security office, which had taken several extra months due to closures related to the COVID-19 pandemic. On November 6, 2020, DCFS informed the juvenile court that it had completed its portion of the ICPC paperwork and asked the court to send the paperwork to Georgia so that the Georgia state office could complete its part. The juvenile court signed the order on November 10.

¶9    Reunification services to Father were terminated in February 2021 due to Father's noncompliance with the child and family plan. In June, the State filed a petition to terminate Father's parental rights.

¶10    In September 2021, the juvenile court held a pretrial hearing on the termination petition, during which the status of the ICPC was discussed. Father's counsel indicated that Aunt had "completed and submitted" to Georgia all the required paperwork. However, DCFS reported that Caseworker had contacted the Georgia state office regarding the ICPC but there had been no information provided as to its status. Father then addressed the court. He explained that Aunt notified him that morning that she had completed the ICPC paperwork. Father also informed the court that he was willing to relinquish his rights to Child if Aunt could adopt her, and he reminded the court that his desire "from the get-go" had been to place Child with Aunt. Based in part on the unresolved questions related to the status of the ICPC, the court scheduled a second pretrial hearing to take place in October.

¶11    At the October pretrial hearing, the State reported the status of the ICPC:

> [DCFS] was able to get an update from the state of Georgia and that update was filed with the Court. It does show that there were some additional documents that need to be turned in. There was a deadline of July 30th for those to be submitted and as of the date of the report which is dated September 13th, they have not been turned in. I don't think we have anything more current than that as far as what's happening with the ICPC but it appears that is stalled until the family turns in the necessary documents.

In response to this update, Aunt told the court that she had submitted the completed ICPC paperwork, completed a required class, and was currently participating in a home study. After discussing the status of the ICPC, the parties discussed its relevance. The guardian ad litem (the GAL) and the State indicated that the ICPC was a "backup plan" because Child was in a kinship placement with Foster Family and had been there for a "long" time. Mother and Father disagreed with this assessment. Counsel for both parents stated that the original reason for requesting the ICPC was to allow Aunt to be the primary placement. Following this discussion, the court concluded that regardless of Child's placement goal, the parties were in "a holding pattern" and Child could not yet be placed with Aunt because "the home study hasn't been approved" and the ICPC was therefore not complete.

¶12    Trial on the State's petition to terminate parental rights began in November 2021. Despite having proper notice, Father failed to appear at the termination trial. Father's counsel moved to be released due to this failure, and the juvenile court granted counsel's motion. The trial then proceeded by proffer. At the close

of trial, the court entered an order terminating Father's parental rights, which Father subsequently appealed. Thereafter, the State, the GAL, Father, and Mother filed a stipulated motion for summary reversal. This court granted the motion and accordingly vacated the termination order and remanded the matter for a new trial.

¶13　The second termination trial occurred over the course of three days in April 2022. The juvenile court heard testimony from Caseworker, Father, and Child's foster parents (Foster Parents). Caseworker testified that at the beginning of the case, Father expressed interest in having Child placed with Aunt in Georgia. Caseworker explained that because Aunt lives out-of-state, DCFS cannot place Child with Aunt unless Aunt has an approved ICPC. Caseworker testified that she started the ICPC process in April 2020 and that she completed the ICPC paperwork and sent it to Georgia in November 2020. Caseworker stated that she would have been able to submit the paperwork sooner had Father provided Child's social security card and birth certificate to her directly, but because he did not, Caseworker had to obtain the documents from the social security office, which had been closed due to the COVID-19 pandemic.

¶14　Caseworker testified that since submitting the ICPC paperwork, she had received "minimal updates" from Georgia—despite the fact that she had followed up "[a]bout every month"—and that she did not have any control over the Georgia state office. She explained that she did not contact Aunt directly during the ICPC process because the "proper channel" for all communication related to an ICPC is between the state offices; however, Caseworker testified that had Aunt contacted DCFS and requested visitation, DCFS "would have given it to her." Caseworker noted that the most recent ICPC update from Georgia was given on February 3, 2022, which stated, "Home study is being written with an expected completion date of 2/14/2022. Will be sent for approval at that time." At the time of trial, however,

Caseworker had not been informed whether the home study had been approved or not, nor had she received any kind of final report on the ICPC.

¶15 Lastly, Caseworker testified that under DCFS guidelines, Child was considered to be in a kinship placement because she was placed with Foster Family—the family that had adopted two of Child's biological half-siblings. Caseworker also noted that DCFS has no "level of preference" for different kinship placements. Therefore, even if the approved ICPC had been received, DCFS had already satisfied its "internal standards" by placing Child with kin.

¶16 Regarding placement options, Father testified that although Child "is in good hands" with Foster Family, he wanted her to be placed with Aunt, a desire that he had expressed since the beginning of the case. Father acknowledged that Aunt has never met Child and that removing Child from Foster Family would be a "disruption." However, Father blamed DCFS for the delay in the ICPC approval, claiming that Aunt had done "everything she possibly could."

¶17 Foster Parents both testified about Child's strong relationship with Foster Family. Child's foster mother (Foster Mother) stated that Child is "almost inseparable" from her foster sibling and that Child and her biological half-siblings "have a great relationship." Foster Parents expressed their desire to adopt Child, and Foster Mother explained that it would be "devastating" for the entire family, including Child, if Child were to be removed from their home.

¶18 In addition, Foster Mother testified that allowing Child to remain in contact with Father might not be in her best interest because "[t]here's just a lot of anxiety that happens with [Child] after visits." Specifically, Child "was having night terrors . . . when we were doing visits. She would wake up crying, but you couldn't actually wake her up. She was just crying . . . ." Foster

Mother stated that the night terrors stopped when the visits with Father stopped.

¶19 Moreover, Father had a history of engaging in violent and threatening behavior. Specifically, Father threatened Caseworker when she canceled a visit after Father failed to check in, and from then on, DCFS was required to provide extra security during Father's visits. Father also threatened Foster Parents and had been found looking up Foster Parents' contact information. And Father admitted to committing violent acts against Mother on several occasions.

¶20 On June 28, 2022, approximately two months after the termination trial, the juvenile court entered a thirty-page order terminating Father's parental rights to Child. The court found that DCFS made "reasonable efforts" in pursuing the ICPC, including that Caseworker had worked to obtain the necessary documentation and complete the ICPC paperwork as quickly as possible, that Caseworker followed up on the status of the ICPC "about every month," that Georgia had provided "minimal updates" on the ICPC throughout the case, and that Father's testimony that Aunt had completed the ICPC and was "cleared" was not credible. Further, the court found that it was in Child's best interest to remain with Foster Family because Child had become "integrated" into Foster Family, because Child had developed strong bonds with her foster sibling and half-siblings, and because removing Child from her existing placement would be difficult. Moreover, the court found that Aunt "did not request contact with [Child] and has not met her." Based on these findings, the court concluded that termination was strictly necessary to protect Child's best interest. It explained:

> [T]his Court must consider all the permanency options for [Child] and whether she can be equally protected and benefitted by an option other than termination. One option is for a placement with

[Aunt] in Georgia. However, at the time of trial the ICPC had not been approved, legally barring such placement. Further, at this point, the placement is not in [Child's] best interest. [Child] has never met [Aunt] and [Aunt] has never requested visits with her. [Child] has no familial relationship with [Aunt]. . . . When viewed from [Child's] point of view, as required by statute, termination is strictly necessary so that the loving family attachments she has made with [Foster Family] and her biological [half-siblings] can be preserved through adoption.

¶21 Father filed a notice of appeal of the juvenile court's termination order on July 7, 2022. On July 18, the court held a post-termination review hearing. Because Father's parental rights had been terminated, he did not attend the hearing; only the State, Caseworker, and the GAL were present. The parties discussed Child's welfare as well as the status of the ICPC. Following the hearing, the court issued an order indicating that the ICPC had been approved but declining to alter Child's placement. The court reasoned as follows:

[DCFS's] court report indicates that [Child] continues to do well in the foster placement with her biological siblings. In June, 2022 [DCFS] received an approved ICPC from Georgia for [Aunt]. [Aunt] has never met [Child] and has no relationship with her. She never requested contact or updates during the case. It would not be appropriate or in [Child's] best interest to change placements at this point in the case so [DCFS] sent a Case Closure Form to Georgia.

ISSUE AND STANDARDS OF REVIEW

¶22 Father appeals the juvenile court's order terminating his parental rights to Child, arguing that the court erred in

concluding it was strictly necessary to terminate his parental rights. "We review deferentially a lower court's best-interest determination and will overturn it only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence."[5] *In re J.J.W.*, 2022 UT App 116, ¶ 18, 520 P.3d 38 (quotation simplified)*.* However, Father acknowledges that he did not raise this issue below, and he therefore asks us to review the court's strictly necessary determination for plain error.[6] To

---

5. Father devotes a significant portion of his briefing arguing that we should review the juvenile court's strictly necessary determination de novo. We decline to do so. In *In re E.R.*, 2021 UT 36, 496 P.3d 58, our supreme court was specifically asked to replace the deferential standard of review applied to best interest determinations with a non-deferential, de novo standard. *Id.* ¶¶ 5–6. The court declined to do so, *see id.* ¶ 26, and we are bound by that decision, *see State v. Benson*, 2014 UT App 92, ¶ 28, 325 P.3d 855 ("Vertical stare decisis compels a court to follow strictly the decisions rendered by a higher court." (quotation simplified)), *cert. denied*, 333 P.3d 365 (Utah 2014).

6. The question of whether plain error review is available in ordinary civil cases has not yet been answered by the Utah Supreme Court. *See In re J.A.L.*, 2022 UT 12, ¶ 12 n.3, 506 P.3d 606. But the question of whether plain error review is available in the context of a parental rights termination proceeding—which, although civil in nature, "involve[s] significant interests on par with those at issue in criminal cases," *see Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 42 n.10, 507 P.3d 357—is currently pending before our supreme court. For purposes of this appeal, we assume, without deciding, that plain error review is available in termination proceedings. This assumption is academic here, however, because Father has not demonstrated that the juvenile court erred, let alone plainly so. Therefore, "we

(continued…)

succeed on a claim of plain error, Father must show that "(1) an error exists; (2) the error should have been obvious to the juvenile court; and (3) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *In re S.T.*, 2022 UT App 130, ¶ 14, 521 P.3d 887 (quotation simplified).

ANALYSIS

¶23    Father argues the juvenile court erred in determining that it was strictly necessary to terminate his parental rights because the court did not adequately consider other feasible placement options for Child. Father's challenge largely concerns the court's consideration of the ICPC and whether Aunt was a feasible placement option. Because Father did not raise this issue below, to succeed on appeal he must show that a harmful error exists and that the error should have been obvious to the juvenile court. *See In re J.A.L.*, 2022 UT 12, ¶ 12, 506 P.3d 606.

¶24    "Because the relationship between parent and child is constitutionally protected, a court may only terminate parental rights upon a finding that termination is strictly necessary to the best interest[] of the child."[7] *In re S.T.*, 2022 UT App 130, ¶ 33, 521 P.3d 887 (quotation simplified). Here, the juvenile court determined it was strictly necessary to terminate Father's parental rights because there was no option available, short of termination and adoption, that would equally protect and benefit Child. In

_____

simply hold that [Father] has not carried [his] burden of showing plain error." *See In re J.A.L.*, 2022 UT 12, ¶ 12 n.3.

7. To terminate a parent's rights, the State must prove both that statutory grounds for termination are present and that termination is in the child's best interest. *See In re S.T.*, 2022 UT App 130, ¶ 25 n.5, 521 P.3d 887. Because Father challenges only the juvenile court's best interest determination, our discussion is limited to this portion of the court's ruling.

making this determination, the court considered, among other options, permanent guardianship with Foster Parents and permanent guardianship with Aunt. Ultimately, the court decided against placement with Aunt for two reasons. First, Aunt was in Georgia, and "at the time of trial the ICPC had not been approved, legally barring such placement." Second, placement with Aunt was not in Child's best interest because Child "has never met [Aunt] and [Aunt] has never requested visits with her. [Child] has no familial relationship with [Aunt]."

¶25    Father assails the juvenile court's reasoning on both points. As to the first, Father contends the ICPC was approved before termination was ordered and therefore it should have been adjudicated with the termination petition. And as to the second, Father contends the court's analysis was inadequate and based on categorical concerns. For the reasons discussed below, his attack is unavailing.

¶26    First, Father mischaracterizes the record regarding the ICPC. Father asserts that the ICPC "was definitively completed before the written order of termination of parental rights [was] entered" but that the results were "concealed by DCFS until post-termination proceedings."[8] But Father's position on this point is undermined by his concession that "[n]one of the parties can conclusively state [when the ICPC was approved] because [DCFS] never presented this information." Indeed, it is unclear from the record whether DCFS received the approved ICPC before or after the court entered its final order terminating Father's parental rights. The only definitive information available in the record is

---

8. In his opening brief, Father also argued that "DCFS had received the approved [ICPC] *before the termination trial commenced*." (Emphasis added.) Although Father concedes in his reply brief that this assertion is not explicitly supported by the record, he nevertheless maintains that the "chronology" of the case is sufficient to support such presumption.

that the termination trial was held in April 2022; the court entered its termination order on June 28; and on July 18, the court held a post-termination review hearing, during which DCFS reported that in June 2022 it had "received an approved ICPC from Georgia" for Aunt. Therefore, while the approved ICPC *may* have been received by DCFS while the matter was still under advisement by the court, Father has not demonstrated that this was absolutely the case.

¶27    Furthermore, regardless of whether the approved ICPC was presented to the juvenile court pre- or post-termination, on the facts of this case, Father cannot demonstrate that the court's strictly necessary determination would have been any different had it received the ICPC earlier.[9] As an initial matter, it is undisputed that DCFS informed the court about the approved ICPC and the court considered the implications of that approval during a post-termination review hearing. Indeed, during the review hearing, the court stated that although the ICPC for Aunt had been approved, "[i]t would not be appropriate or in [Child's] best interest to change placements at this point in the case." The court reasoned that Child "continues to do well in the foster placement with her biological [half-]siblings," whereas Aunt "has

---

9. Father asserts in passing that the two-year delay in approving the ICPC was caused by DCFS "drag[ging] its feet." While such a delay in approving an ICPC may be troubling and unfortunate, *see In re A.H.*, 2022 UT App 114, ¶ 45, 518 P.3d 993, *cert. granted*, 525 P.3d 1279 (Utah 2023), there is no indication that DCFS was responsible for the delay here. Rather, the record indicates that Caseworker started the ICPC process at the beginning of the case and followed up on its progress throughout the case and that any delay was likely attributable to a combination of Father's inaction in providing Child's social security card and birth certificate, the time it took Aunt to submit her paperwork and complete the required classes, and general administrative delays caused by the COVID-19 pandemic.

never met [Child] and has no relationship with her. [Aunt] never requested contact or updates during the case." Because the court's decision to not change Child's placement post-termination rested at least in part on Aunt's lack of engagement throughout the duration of the years-long case—including *after* the ICPC was approved—there is no indication that an earlier receipt of the approved ICPC would have had any bearing on the court's reasoning. *See In re G.D.*, 2021 UT 19, ¶ 81, 491 P.3d 867 (finding that a juvenile court's strictly necessary analysis was not deficient where the court declined to "admit and consider the evidence [the appellants] presented after trial" because neither Utah law nor Utah caselaw "requires a juvenile court to consider supplemental evidence that merely elaborates on a factor the court already considered in its 'strictly necessary' analysis—especially when that evidence does not address or refute the considerations on which the court relied to reach its conclusion").

¶28 Relatedly, Father glosses over the import of an approved ICPC. While an approved ICPC is a precursor to any out-of-state placement, an approved ICPC does not guarantee placement. After a child is removed from a parent's custody, the juvenile court must "determine whether there is a relative . . . who is able and willing to care for the child." Utah Code § 80-3-302(6)(a). If the court identifies an out-of-state relative as a potential placement, the court must comply with the procedures and requirements outlined in the ICPC before ordering that the child be placed in another state. *See id.* § 80-2-905. Following the approval of an ICPC, the court "shall give preferential consideration to a relative's . . . request for placement of the child, *if the placement is in the best interest of the child.*" *Id.* § 80-3-302(7)(a)(i) (emphasis added). In other words, the plain language of the statute "does not guarantee that an identified relative . . . will receive custody of the child." *Id.* § 80-3-302(18). Accordingly, the court was not required to place Child with Aunt if doing so was not in Child's best interest. And as discussed below, the

court's best interest analysis was adequate to foreclose placement with Aunt.

¶29   Moreover, contrary to Father's assertion, the juvenile court properly considered feasible placement options other than termination and adoption. As stated above, the court articulated two reasons in support of its strictly necessary determination. In addition to concluding that Aunt was legally barred as a placement option because the ICPC was still pending, the court found that placement with Aunt was not in Child's best interest because Child "has never met [Aunt] and [Aunt] has never requested visits with her. [Child] has no familial relationship with [Aunt]." On the facts of this case, this determination was not erroneous.

¶30   Our legislature has expressed a strong preference for maintaining familial bonds. To that end, a court may terminate a parent's rights only if termination is strictly necessary to promote a child's best interest. Courts ordering termination "must start the best interest analysis from the legislatively mandated position that '[w]herever possible, family life should be strengthened and preserved.'" *In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827 (quoting Utah Code § 80-4-104(12)(a)). However, once a parent is found to be unfit, a court may terminate the parent's rights if doing so "is strictly necessary for the welfare and best interest of the child." *Id.* ¶ 62. At this stage, the court must "consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered." Utah Code § 80-4-104(12)(a).

¶31   In evaluating whether termination is strictly necessary, a juvenile court must consider, "among other relevant factors," whether "the efforts to place the child with kin who have, or are willing to come forward to care for the child, were given due weight." *Id.* § 80-4-104(12)(b)(ii). This requires the court to "explore whether other feasible options exist that could address

the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified). This inquiry cannot be satisfied merely by relying on the "categorical concern" that adoption offers the highest degree of permanency." *In re J.A.L.*, 2022 UT 12, ¶ 25. Instead, the court must analyze the "particularized circumstances of the case" and explore whether an alternative arrangement "can equally protect and benefit the children in the case before it." *Id.* (quotation simplified). And "when two placement options would equally benefit a child, the strictly necessary requirement operates as a preference for a placement option that does not necessitate termination over an option that does." *In re G.D.*, 2021 UT 19, ¶ 75.

¶32    Father contends the juvenile court erred in finding that termination was strictly necessary because the court ignored that Aunt "was the preferred placement" and instead relied on "categorial concerns" to support its determination. However, neither point is well taken, and the court's rationale is sufficient to justify its decision to terminate Father's parental rights.

¶33    Father asserts that Aunt "was the preferred placement" because "[t]his is a case where both placement options would equally benefit" Child and "placement with [Aunt] did not necessitate termination of parental rights." This assertion is without merit. Our caselaw is clear that the preferential status afforded to a placement option that does not necessitate termination exists only where the two placement options "equally benefit" the child. *See id.* But here, there is no evidence to suggest that placement with Aunt would "equally benefit" Child.

¶34    Indeed, the juvenile court's comprehensive termination order included multiple findings concerning Aunt. Specifically, the court found that Caseworker had contacted Aunt in May 2020 to start the ICPC process. Despite this contact, at the time of trial approximately two years later, Aunt had "not request[ed] contact

with [Child] and [had] not met her." Although Aunt may have not been available as a placement option prior to approval of the ICPC, nothing was preventing her from contacting Child and forming a relationship with her. And given the duration of the proceedings, Aunt was given ample time to do so.

¶35　Conversely, the juvenile court found that Child was in an appropriate adoptive placement with Foster Family. Among other things, Child had been living with Foster Family since "shortly before she turned one month old," and Child had developed strong bonds with her foster sibling and two half-siblings. Yet Father does not grapple with the import of these relationships. Notably, Child *is* in a kinship placement with Foster Family since Child's biological half-siblings were adopted into Foster Family. Moreover, as this court has recently recognized, "the biological connection between siblings matters." *See In re A.H.*, 2022 UT App 114, ¶ 42, 518 P.3d 993 ("The importance of sibling relationships is well recognized by courts and social science scholars, because a sibling relationship can be an independent emotionally supporting factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s) which truly cannot be derived from any other. Such bonds are often especially important to children who experience chaotic circumstances like abuse or neglect, because in such circumstances, they learn very early to depend on and cooperate with each other to cope with their common problems." (quotation simplified)), *cert. granted*, 525 P.3d 1279 (Utah 2023). Given the court's competing findings about each potential placement, we cannot say that placing Child with Aunt—an individual she has never met—would equally benefit Child where Child is already in a kinship placement with her half-siblings. As a result, Aunt was not a preferred placement.

¶36　Moreover, the juvenile court did not merely rely on categorical concerns when determining that termination was

strictly necessary. On this point, Father contends the court's decision was based on the categorical concern that removing a child from a foster family with whom the child is bonded will disrupt and negatively impact the child's life. *See id.* ¶ 56. To be sure, the court's determination hinged in large part on Child's attachments to Foster Family, including to her two biological half-siblings, and the potential detriment to Child that would result from removal from that placement. However, the court's conclusion was also based on the fact that Aunt's relationship with Child was nonexistent and that placing Child with Aunt would therefore be particularly destabilizing. Consideration of the effects of a potential disruption, when based on case-specific facts, is entirely proper. Indeed, courts are statutorily required to consider continuity of care when determining whether to terminate parental rights. *See* Utah Code § 80-4-303(1)(a) (requiring courts to consider "the physical, mental, or emotional condition and needs of the child"); *id.* § 80-4-304(5) (requiring courts to consider "the length of time the child has lived in a stable, satisfactory foster home and the desirability of the child continuing to live in that environment"). And this court has recently recognized as much, noting that the potential effect of changing a placement is "a legitimate concern, and one that courts should take into account." *In re A.H.*, 2022 UT App 114, ¶ 56. In sum, the court's determination here was not based on a categorical concern inasmuch as the court considered case-specific facts such as the impact of the potential disruption in light of Child's nonexistent relationship with Aunt.

¶37    Finally, and very importantly, even if Father is correct in his assertion that the ICPC was completed before the termination trial, the ICPC approval and resulting potential for placement with Aunt was not the lynchpin of the juvenile court's strictly necessary determination. As discussed above, placement with Aunt was not in the best interest of Child because of the shortcomings in that option as identified by the court. And a permanent guardianship with Foster Parents put in place to

preserve Father's residual parental rights and ensure Child's connection to her half-siblings was also not in Child's best interest as the court identified significant problems with Father's continued parental connection to Child vis-à-vis Foster Family. Specifically, the court found that Child had "already experienced anxiety and night terrors during visits" with Father and that Father's "threats toward [Foster Family] and his propensity for violence puts [Child and Foster Family] at risk."

CONCLUSION

¶38 Father has not shown the juvenile court clearly erred in determining that it was strictly necessary to terminate his parental rights. Regardless of when the court received the approved ICPC, it adequately considered the results. Further, an approved ICPC does not guarantee placement, and Father has not demonstrated that the court plainly erred when considering other feasible placement options. Accordingly, we affirm the court's order terminating Father's parental rights.

———————