**2024 UT App 185**

# THE UTAH COURT OF APPEALS

IN THE MATTER OF D.A.T.R.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.K.,
Appellant,
*v.*
T.K. AND K.K.,
Appellees.

Opinion
No. 20230543-CA
Filed December 19, 2024

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
The Honorable Laura Scott
No. 222900420

Jason B. Richards and Alexandra Mareschal,
Attorneys for Appellant

Theodore Weckel, Attorney for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

ORME, Judge:

¶1      For over twenty years, A.K. (Mother) has struggled with drug addiction and has been continually involved in the criminal justice system. In 2022, Mother's parole officer found methamphetamine in her wallet, resulting in her arrest and incarceration. Mother's brother and sister-in-law, T.K. and K.K. (collectively, Guardians), who live in Idaho, eventually took over the care of Mother's nine-month-old daughter, D.A.T.R. (Child). Not long afterward, a Utah district court granted Guardians temporary guardianship of Child pursuant to the Probate Code.

¶2 The same month Mother was released from jail, Guardians filed a petition in Utah district court to adopt Child. Mother subsequently filed a motion to terminate the probate guardianship. The petition and motion were consolidated into a single case, which proceeded to a two-day bench trial. The trial court found that Mother was unfit because of her habitual substance abuse, and thus, a statutory ground to terminate her parental rights existed. But the court also determined that a permanent guardianship—not termination of Mother's parental rights and adoption—was in Child's best interest. Accordingly, the court granted Guardians permanent guardianship of Child. In light of this ruling, the court dismissed Mother's petition to terminate the probate guardianship as moot.

¶3 On appeal, Mother raises several arguments challenging both the prior probate guardianship and the current permanent guardianship. We hold that Mother's arguments related to the probate guardianship are moot, and accordingly we do not reach their merits. As concerns the permanent guardianship, we hold that Mother has not shown plain error or ineffective assistance of counsel regarding any alleged failure to comply with the Interstate Compact for the Placement of Children (the ICPC). And we affirm the trial court's determination that Mother is unfit.

BACKGROUND[1]

¶4 For most of her adult life, Mother has struggled with illegal drug use, particularly methamphetamine. As a result, even by her own admission, Mother was not a good parent to her three older children (the Older Children) as she was unable to care for them for any meaningful period of time. The trial court found the Older Children "suffered neglect and experienced trauma" due to

---

1. We recount the findings of fact the trial court entered following a bench trial, which findings Mother does not challenge on appeal.

Mother's drug use and that they continued to struggle at the time of trial in this case. The Older Children have primarily been raised by their maternal grandmother (Grandmother), who in 2014 sought and was granted guardianship of them. Mother's siblings have also actively helped care for the Older Children. By the time of trial, Mother had not sought to terminate Grandmother's guardianship of the Older Children, so it remained in place.

¶5 Mother's drug use has also resulted in her involvement with the criminal justice system throughout her adult life. Between 2009 and 2022, she had "been on probation, on the run, or in jail or prison" most of the time. As relevant here, in 2018, Mother was sentenced to prison for burglary. After spending a little over two years in prison, she was released on parole.

¶6 Several months after her release, Mother became pregnant with Child, who was born in August 2021. During her pregnancy, Mother was employed and there was no indication that she was using drugs or engaged in criminal activity. Both during the pregnancy and after Child's birth, Mother lived with Grandmother and the Older Children. For the first time, Mother was able to spend time and engage with the Older Children.

¶7 Following Child's birth, Mother suffered from postpartum depression and was unable to maintain her employment. Nevertheless, with the help of Grandmother and Child's then-15-year-old sister (Sister), Mother was able to care for Child and "they developed a strong bond with each other." During this time, Mother and Child also spent a lot of time with Child's godmother (Godmother), who lived nearby. Mother and Godmother were middle school friends who reconnected a few months prior to Child's birth.

¶8 In May 2022, a parole officer found methamphetamine in Mother's wallet during a search of the house. At trial in the current matter, Mother admitted to purchasing and using

methamphetamine "one time."[2] Mother was arrested and taken to jail. Child, who was home at the time of Mother's arrest, was left in Grandmother's care. Mother was charged with possession of a controlled substance, possession of a dangerous weapon by a restricted person, and possession of drug paraphernalia. Mother pled guilty to the weapon charge and was sentenced. She was released from jail that November.

¶9    On the day of Mother's arrest, Grandmother sent a message via the family group chat informing Mother's siblings, including Guardians, of the situation and asking for help caring for the children. Grandmother told the siblings that Mother had been arrested because the parole officer found a beer can and a pocketknife in Mother's room—not because he found methamphetamine in her wallet. Grandmother later testified that she was unaware that Mother had relapsed at the time of arrest. Guardians responded to Grandmother's message, indicating that if Mother was going to be away for a while, they were willing to take Child to Idaho and care for her there. Grandmother informed Mother the following day of Guardians' offer to take Child.

¶10   Mother later testified that upon arriving at the jail, she called Godmother and asked her to care for Child. Godmother picked Child up that same day and cared for her for the next two weeks. But because Godmother had to work, Grandmother or Sister cared for Child during the day and Godmother cared for her at night.

---

2. Mother denied relapsing prior to May 2022. Some of her family members began to suspect that she had resumed using drugs in December 2021 when, during a family holiday party, she exhibited behaviors similar to those she displayed when she was under the influence of drugs. But other than the party, family members were unable to identify another instance when they suspected Mother of being under the influence.

¶11 Mother eventually agreed to allow Guardians to take Child to Idaho so long as certain "conditions" were met, which included virtual visits with Mother, not changing Child's pediatrician, and bringing Child to Utah "regularly." Mother testified that this arrangement was to be "temporary," meaning that it was to last only while she remained incarcerated. When Guardians picked Child up in Utah, she required medical attention for a severe diaper rash and sores in her mouth. The trial court found that both conditions likely predated Mother's arrest. Child also did not have a car seat or clothing that fit. Guardians took Child to a pediatrician near their home, who prescribed medication, and they purchased the necessary car seat and clothing. From June until October 2022, Guardians facilitated weekly virtual visits between Child and Mother.

¶12 Mother soon regretted her decision to allow Guardians to take Child and told Grandmother to direct them to return Child to Utah. Mother also wrote a letter indicating that she wanted Child to stay with Godmother, though the letter was not notarized or sent directly to Guardians. Mother attributed her change of heart to "lack of trust" and her fear that Guardians would attempt to "take" Child.[3] She also testified that Guardians had failed to facilitate visits with Child. But the trial court later noted that the jail to which Mother had been transferred allowed only virtual visits or phone calls with Child, which Guardians had facilitated.

¶13 Guardians initially refused to return Child to Utah because Mother's letter was not notarized and because they did not know Godmother's background or relationship with Child. The trial court later found that under the circumstances, "Guardians' initial

---

3. Specifically, Mother testified that she was afraid Guardians would try to "take" Child as they had tried to do with the Older Children. But the trial court noted that there was no evidence that Guardians ever tried to "take" the Older Children.

concerns were reasonable given Mother's previous lack of judgment with respect to the Older Children."

¶14 On June 16, 2022, Guardians filed a petition for guardianship in Utah probate court.[4] The petition alleged that Mother was "unwilling or unable to exercise her parental rights" and that she had "violated parole, been given new charges, ha[d] been arrested, and [was] currently" incarcerated. The trial court later found that "Guardians did not make any misrepresentations in the Guardianship Petition" and that "as a result of her incarceration, Mother was 'unable to exercise her parental rights' because she was unable to care for" Child. The court also found that "[t]here was no credible, much less persuasive evidence, presented at trial that Guardians misrepresented any facts to the probate judge in connection with the Guardianship Petition."

¶15 The day after Guardians filed their petition, they returned Child to Godmother in Utah after receiving a notarized letter from Mother. Given their misgivings about Godmother and about Mother's judgment, Guardians remained concerned about Child. It was also around this time that Guardians learned that Mother had been arrested for methamphetamine possession—not for having a beer can and a pocketknife in her bedroom, as Grandmother had initially told them.

¶16 On July 6, 2022, Mother signed a notarized letter that purported to retroactively give Godmother temporary

---

4. Because the initial guardianship was entered pursuant to the Probate Code, we refer to the district court that ruled on the guardianship petition as "the probate court," and to the resulting guardianship as "the probate guardianship." We refer to the court that ruled on the later adoption petition in the current matter as "the trial court," and to the resulting guardianship as "the permanent guardianship." Different judges presided over the two proceedings before they were consolidated in the trial court.

guardianship of Child from the day of her arrest until "the day of [her] release from incarceration." Mother did not file the letter with the probate court. A week later, on July 13, the probate court held a hearing on Guardians' petition seeking guardianship of Child. Mother was not present at the hearing. She later indicated that this was because the jail failed to make the necessary arrangements. The trial court in the present matter later found it noteworthy that Mother never filed an objection to Guardians' petition prior to the hearing, despite knowing about the upcoming hearing for weeks. Godmother, who appeared virtually at the hearing, did not object or otherwise speak, which she later attributed to technical difficulties.

¶17    Because there were no objections, the probate court granted the guardianship petition, and Godmother returned Child to Guardians. The following day, on July 14, Mother mailed a letter to the probate court indicating that she was "writing to appeal" because she objected "to every part of" the guardianship petition. Although the letter was received and docketed, there is no indication that it was forwarded to the responsible judge. Mother did not otherwise take any action to set aside the probate guardianship until after she was released from jail in November 2022.

¶18    Child continued to have weekly virtual visits with Mother until October 2022, at which point Guardians stopped accepting Mother's phone calls or facilitating virtual visits. Although there had been some disagreement as to who was to pay for the phone calls, the trial court found that the more likely reason the virtual visits stopped was Guardians' decision to seek to adopt Child.

¶19    On November 7, 2022, Guardians filed a petition for adoption, which was served on Mother later that month. Mother, who had been released from jail sometime that same month, subsequently filed a motion to terminate the probate

guardianship and a motion to intervene in the adoption. The probate court stayed the motion to terminate the guardianship pending the outcome of the adoption case. The trial court granted Mother's motion to intervene and directed that the probate guardianship case be reassigned to the trial court so that the two matters could be consolidated. Because the adoption petition sought to terminate Mother's parental rights, the trial court appointed counsel to represent her.

¶20 At subsequent status conferences, the trial court ordered that Mother have virtual and supervised in-person visits with Child, which commenced on a regular basis thereafter. At the first supervised in-person visit, Child did not appear to recognize Mother, and Grandmother did not observe a bond between the two, although with each subsequent visit, Child became more comfortable with Mother. Conversely, Child had developed a strong bond with Guardians. Child considered Guardians her parents and viewed their children as her siblings. Guardians had provided for Child financially, and she was "thriving" in their "permanent, stable, and healthy home."

¶21 In March and May 2023, the matter proceeded to a two-day bench trial on Mother's motion to terminate the probate guardianship and on Guardians' adoption petition. In June, the trial court entered its findings of fact and conclusions of law. The majority of the court's findings are summarized above. The court also found that there was "no question that Mother loves . . . Child very much and wants to be part of her life" and that there was "also no question that Mother is sincere in her desire to live a sober and productive life and that she is taking important steps to address her substance use issues." Mother had voluntarily enrolled in a 90-day drug treatment program in early December 2022, but she had not graduated by the last day of trial in May 2023 in part due to her being sanctioned for testing positive for alcohol on one occasion.

¶22 In its conclusions of law, the trial court first addressed Mother's motion to terminate the probate guardianship. The court concluded that the motion was moot because the court was also considering whether Mother's parental rights should be terminated. But the court ruled that in any event, Mother's motion would have been denied because there was no evidence that Guardians committed fraud, made misrepresentations, or otherwise engaged in misconduct in obtaining the probate guardianship—as Mother had alleged; Mother's due process rights were not violated; and it was unlikely that Mother's post-hearing letter objecting to the guardianship petition would have resulted in a different outcome if considered by the probate court.

¶23 The trial court next turned to the issue of termination of Mother's parental rights—a necessary precondition to adoption in the absence of Mother's consent. The court concluded that a ground for termination existed. Specifically, the court held that Guardians had established by clear and convincing evidence that "Mother is unfit because of her habitual use of dangerous drugs that render her unable to care for" Child. The court considered Mother's history of drug use to be relevant for the following reasons:

- In the over twenty years since Mother began using drugs, she had not had any significant period of sobriety or employment.

- Mother had not parented the Older Children for any meaningful period of time.

- During the few months that Mother cared for Child, she "was unable to maintain employment or live on her own and relied on Grandmother and [Sister] (who should have been in school) for assistance."

- It was undisputed that when Mother is using drugs, "she is incapable of caring for the children not only because of the effect it has on her but because of the legal consequences of relapse, i.e., a violation of parole or probation and incarceration."

- "[I]t is impossible to predict whether Mother's current efforts [to maintain sobriety] will prove successful."

¶24 The trial court acknowledged "Mother's current efforts over a short period of time—while certainly encouraging—do not overcome her lengthy history of drug abuse, which has rendered her unfit to care for the Older Children for 16 years and incapable of caring [for] Child for almost half of her young life." The court further stated that it was "unable to conclude that Mother's situation is 'stable' or that her risk of relapse is 'low,' especially given her use of alcohol shortly before trial."[5] The court indicated that the fact that Mother had not yet completed the 90-day treatment program by the last day of trial, which she began five months earlier, suggested that she "is not yet capable of providing the stability and protection that . . . Child deserves." And the court was also concerned by "Mother's focus on . . . Child as the key to her sobriety, which creates a significant risk that . . . Child will grow up feeling like she is responsible for Mother or needs to take care of her." The court noted that "there was compelling evidence at trial that this parentification has already happened with [Sister], who Mother brought to trial for 'emotional support.'" The court also stated that as a result of Mother's relapse and subsequent incarceration, the bond between Mother and Child had been severed and Child now viewed Guardians as her

---

5. The trial court recognized that alcohol was not Mother's "drug of choice," but it stated that the treatment program Mother was enrolled in prohibited alcohol consumption and "individuals in long-term recovery are advised to avoid [alcohol] because it can trigger a relapse cycle."

parents. Although the bond between Mother and Child could be re-established, the court noted that Child may nevertheless have been harmed by the severance.

¶25 The trial court stated that it was not discounting Mother's love and prior care for Child, but it also could not ignore that Mother struggled with depression, was unable to maintain employment, brought methamphetamine to the home she shared with Child, or that Child suffered from severe diaper rash and sores in her mouth immediately prior to Mother's relapse.

¶26 Finally, the trial court expressed concern regarding "Mother's anger towards Guardians and her apparent desire to sever the bond between Guardians and" Child. Specifically, Mother testified that if she were to be incarcerated again, she would give guardianship of Child to Godmother rather than to Guardians. The court stated that "[t]his position reflects a lack of judgment and a failure to focus on what would be best for the Child, even if it conflicts with what might be most comfortable for Mother." Ultimately, the court concluded that Mother is unfit.

¶27 Having concluded that a ground for termination existed, the trial court next addressed whether termination of Mother's parental rights was in Child's best interest and whether it was strictly necessary. The court concluded that "a permanent guardianship would serve . . . Child's best interests at least as well as adoption" because "a permanent guardianship would not result in the complete severance of . . . Child's familial bonds with Mother and the Older Children"; it would benefit Child to maintain a relationship with Mother so long as she is able to maintain sobriety; and "Child can be 'equally protected and benefitted by' a permanent guardianship because it preserves the status quo and creates permanency because Mother would not be permitted to petition the Court to dissolve the guardianship." The court further stated that "[a] permanent guardianship also advances the goals of reunification, *i.e.*, the preservation of the

relationship between Mother and . . . Child" because it "is a practical way to keep Mother meaningfully involved in . . . Child's life while ensuring that . . . Child remains safe and protected in a stable and loving and healthy environment."

¶28 The court also determined that it would not be in Child's best interest to return her to Mother because Child's "'physical, mental, or emotional condition and needs' would not be served by removing her from Guardians' care," especially if the bond she shared with them was severed and then she was returned to their care at a later point; Guardians' continued care of Child would allow Mother to proceed with her recovery without the looming threat of relapse resulting in termination of her parental rights; "remaining with Guardians allows Child to separate her love [for] Mother from the emotional burden of being raised by someone who has struggled with addiction for her entire adult life"; and Child would "be left in limbo for years" if she were returned to Mother.

¶29 The court thus concluded that termination of Mother's parental rights was not strictly necessary and that it was in Child's best interest that Guardians be granted a permanent guardianship "with Mother having limited rights to be informed about . . . Child and to have regular parent-time" with Child. The court subsequently entered an order of permanent guardianship that included a detailed parenting plan for Mother.

¶30 Mother appeals.

ISSUES AND STANDARDS OF REVIEW

¶31 Mother's arguments on appeal can be categorized as challenges to the probate guardianship and as challenges to the permanent guardianship. In challenging the probate guardianship, Mother argues that due to several alleged errors in the proceedings before the probate court, the guardianship was

void ab initio. Alternatively, she argues that the trial court erred in not terminating the probate guardianship after the probate guardianship and adoption cases were consolidated. For the reasons discussed in Part I below, Mother's challenges to the probate guardianship are moot, and we therefore lack judicial power to address their merits. *See Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 12, 289 P.3d 582.

¶32 In challenging the permanent guardianship, Mother makes two primary arguments.[6] First, Mother contends that the

---

6. Mother also argues that the trial court misapplied the Adoption Act when it did not provide reunification services. She asserts that this issue "is preserved because the [trial] court raised the issue sua sponte in the findings." Specifically, the court included a footnote in its findings of fact and conclusions of law stating,

> When parental rights are terminated under the Adoption Act and the Court enters an adoption decree, the Act does not provide for continued court involvement because a new parent-child relationship has been formed and the parent's rights in, and obligations to, the child are extinguished. In such cases, there is no provision for reunification of the parent and the child.

But here, the trial court did not enter an adoption decree creating "a new parent-child relationship" between Guardians and Child, nor did it fully terminate Mother's parental rights. Furthermore, in discussing why it was granting a permanent guardianship, the court stated that "[a] permanent guardianship also advances the goals of reunification, *i.e.*, the preservation of the relationship between Mother and" Child. We thus disagree with Mother's assertion that the court sua sponte ruled that reunification services were not available in this case.

permanent guardianship violated the ICPC.[7] Mother acknowledges that this issue was not preserved and asks us to review it for plain error or, alternatively, for ineffective assistance of counsel. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195, *cert. denied*, 525 P.3d 1254 (Utah 2022). Second, Mother asserts that in determining that she was unfit, the court failed to engage in a statutorily mandated protocol. "The proper interpretation and application of a statute is a question of law which we review for correctness." *McFarland v. McFarland*, 2021 UT App 58, ¶ 19, 493 P.3d 1146 (quotation simplified).

## ANALYSIS

### I. The Probate Guardianship

¶33 Mother raises several challenges to the probate guardianship. Specifically, she argues that the guardianship was void because (i) Godmother was not given notice of the hearing on Guardians' guardianship petition, (ii) Mother was unable to participate at the hearing, (iii) the probate court did not address Mother's post-hearing letter objecting to the probate guardianship, and (iv) "the probate court ignored Mother's parental presumption and right to designate a guardian." Mother also argues that the trial court erred in denying her motion to terminate the probate guardianship after the probate guardianship case and the adoption case were consolidated.

---

7. Mother contends that the probate guardianship also violated the ICPC. But because, as discussed in Part I below, her challenges to the probate guardianship are moot, we limit our review of the ICPC issue to the argument pertaining to the permanent guardianship.

¶34 Before we can address the merits of Mother's arguments, we must address whether they are moot. *See Ramos v. Cobblestone Centre*, 2020 UT 55, ¶ 22, 472 P.3d 910 (stating that "mootness is a threshold determination"). The mootness doctrine "is a constitutional principle limiting our exercise of judicial power under article VIII of the Utah Constitution." *Transportation All. Bank v. International Confections Co.*, 2017 UT 55, ¶ 14, 423 P.3d 1171 (quotation simplified). It "is not a simple matter of judicial convenience or an ascetic act of discretion." *Id.* (quotation simplified). "The defining feature of a moot controversy is the lack of capacity for the court to order a remedy that will have a meaningful impact on the practical positions of the parties." *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 24, 289 P.3d 582. In other words, a case is moot when "the parties' interest in [the case's] resolution is purely academic." *Id.* *See Transportation All. Bank*, 2017 UT 55, ¶ 15 ("A case may be mooted on appeal if the relief requested is rendered impossible or of no legal effect.") (quotation simplified).

¶35 Here, the trial court held that Mother's motion to terminate the probate guardianship was moot because the court was also deciding whether Mother's parental rights should be terminated. And ultimately, the probate guardianship was replaced with the permanent guardianship. On appeal, Mother contends that her challenges to the probate guardianship are not moot because the failure to terminate that guardianship "infected" the trial court's findings supporting the permanent guardianship.[8] Specifically, Mother asserts that the probate guardianship contributed to the trial court's findings that Grandmother did not observe a bond between Mother and Child during their first supervised in-person

---

8. Mother has not argued that an exception to the mootness doctrine applies to this case. *See State v. Jones*, 2024 UT App 13, ¶ 4, 544 P.3d 1043 (discussing the exceptions to the mootness doctrine).

visit, although Child was becoming more comfortable with Mother with each subsequent visit;[9] that Child had developed strong bonds with Guardians and their children to the point that Child considered them her family; that Guardians provided Child with a "permanent, stable, and healthy home"; and that Child was "thriving" in Guardians' care. Mother contends that but for the probate guardianship, Child would not have been placed with Guardians and never would have developed the strong bond the trial court relied on in granting the permanent guardianship. She asserts that the trial court "completely ignored these ill-gotten gains in its findings."

¶36    Our Supreme Court's recent decision, *In re A.H.*, 2024 UT 26, 554 P.3d 969, addressed this same basic issue. In that case, the Division of Child and Family Services (DCFS) removed seven siblings from their parents' care and placed them in foster care. *Id.* ¶¶ 6, 8–9. At one point, the possibility of all seven children being placed with their grandparents was raised. *Id.* ¶ 10. But because the grandparents lived out-of-state, the juvenile court ordered DCFS to begin the ICPC process in July 2019. *Id.* ¶¶ 10–11. DCFS did not actually begin the process until three months later, and the grandparents were not approved for placement until October 2020—the same month that trial on the termination of the parents' parental rights commenced. *Id.* ¶¶ 11–12. In the meantime, the two youngest children were placed with a foster family separate from their siblings, *id.* ¶ 9, and did not have regular visitation with their siblings, *id.* ¶ 53. As a result, the bonds between the two youngest children and their siblings deteriorated. *Id.*

¶37    Following the termination trial, the juvenile court concluded that it was in the two youngest children's best interest to be adopted by their foster family, *id.* ¶ 27, and, in accordance

_____

9. The trial court also found that the bond between Mother and Child had been severed due to Mother's relapse and resulting incarceration.

with the parties' stipulation, in the older children's best interest to be placed under the permanent guardianship of their grandparents, *id.* ¶¶ 12, 22. The court based its decision, in relevant part, on the strong bond the youngest children had developed with their foster parents and their foster siblings and the fact that the children "had more in common with their foster siblings than with their biological siblings." *Id.* ¶ 23. In contrast, the grandparents were "biological, legal, and factual strangers" to the youngest children, *id.* ¶ 24 (quotation simplified), and the separation caused the children's bonds with their older siblings "to deteriorate to the point that they were little more than biological," *id.* ¶ 62. The court further found that breaking the children's bond with their foster family by placing them "with their grandparents and biological siblings would be very detrimental to them and would put them at unnecessary risk for future emotional and mental health issues." *Id.* ¶ 23 (quotation simplified).

¶38 On appeal, this court reversed the juvenile court's termination decision on the ground that the court's "best-interest determination was against the clear weight of the evidence presented at trial." *In re A.H.*, 2022 UT App 114, ¶ 57, 518 P.3d 993, *rev'd*, 2024 UT 26. This conclusion was based, in part, on the consideration that the deterioration of sibling bonds was "largely the result of decisions made by DCFS and the court during the pendency of these proceedings." *Id.* ¶ 41. This court cautioned that "a court must be careful not to ascribe too much weight to circumstances that are of the court's own making." *Id.*

¶39 On certiorari, our Supreme Court reversed this court's decision. *In re A.H.*, 2024 UT 26, ¶ 73. The Court instructed that the best-interest inquiry "is to be conducted in present-tense fashion, with the effective date of the inquiry being the date of the hearing, trial, or other judicial determination." *Id.* ¶ 55 (quotation simplified). *See id.* ¶ 57 (stating that the juvenile court's "job is to ask: 'what outcome is in the child's best interest *now*?'")

(emphasis in original; quotation simplified). Due to the "present-tense format" of the best-interest inquiry, "a court's ability to assess the past" is limited, *id.* ¶ 56, and the court "should not be unduly swayed by considerations of whether past decisions should have been made differently," *id.* ¶ 61. *See id.* ¶ 56 (stating that "the best interest analysis must focus on the children and their current circumstances"—not on "[w]hether either would have been different in some other hypothetical situation," nor on "who is to blame for the present situation"). Accordingly, the Court held that this court "erred by allowing its review to be influenced by its belief that DCFS and the juvenile court were to blame for the deteriorated sibling bonds." *Id.* ¶ 61.

¶40    In light of our Supreme Court's recent decision, *In re A.H.*, we reject Mother's contention that her challenges to the probate guardianship are not moot because that guardianship set the stage for the trial court's later findings regarding Child's deteriorated bond with Mother and Child's strong bond with Guardians and their family. Even if we were to agree with Mother that the probate guardianship was improperly entered (a determination that, to be clear, we do not make), such a holding would have no effect on our review of the permanent guardianship given our Supreme Court's directive that our review should focus on Child's best interest at the time of trial, *id.* ¶¶ 55–57, and that our review "should not be unduly swayed by considerations of whether past decisions should have been made differently," *id.* ¶ 61.

¶41    In sum, a holding that the probate guardianship was flawed and should have been terminated would not "have a meaningful impact on the practical positions of the parties." *Utah Transit Auth. v. Local 382 of Amalgamated Transit Union*, 2012 UT 75, ¶ 24, 289 P.3d 582. Mother's challenges to the probate guardianship are therefore moot, and we lack judicial authority to reach the merits of her arguments.

## II. The Permanent Guardianship

### A.    The ICPC

¶42    The ICPC is a compact among all fifty states, the District of Columbia, and the U.S. Virgin Islands "to cooperate with each other in the interstate placement of children." Utah Code Ann. § 80-2-905 art. I (LexisNexis 2022).[10] *See In re adoption of B.H.*, 2020 UT 64, ¶ 54 & n.14, 474 P.3d 981. The purpose of the ICPC is to ensure that children requiring placement "receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide necessary and desirable care." Utah Code Ann. § 80-2-905 art. I(1). The ICPC allows the proper authorities of the receiving state to "have full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child"; allows the proper authorities of the sending state to "obtain the most complete information on the basis of which to evaluate a projected placement before it is made"; and promotes "[a]ppropriate jurisdictional arrangements for the care of the children." *Id.* § 80-2-905 art. I(2)–(4).

¶43    Mother argues that the permanent guardianship is void because the trial court granted Guardians, who live in Idaho, permanent guardianship of Child without first complying with ICPC requirements. Because this issue is unpreserved, Mother

---

10. Since the time of trial, the relevant provisions of the Utah Code relating to both the ICPC and the termination of parental rights, addressed in Part II.B., have been renumbered. Because the provisions currently in effect do not materially differ from those in effect at the time of trial, we cite the current version of the code for convenience.

asks us to review it for plain error and ineffective assistance of counsel.

1. Plain Error

¶44 "To demonstrate plain error, a [party] must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful."[11] *In re K.S.*, 2022 UT App 68, ¶ 22, 512 P.3d 497 (quotation simplified), *cert. denied*, 525 P.3d 1262 (Utah 2022). Here, the trial court did not plainly err because any alleged error in not ensuring compliance with the ICPC was not obvious.

¶45 The ICPC directs that

> [n]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child *for placement in foster care or as a preliminary to a possible adoption* unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

Utah Code Ann. § 80-2-905 art. III(1) (LexisNexis 2022) (emphasis added). *See also id.* § 80-2-905 art. III(2) (stating that for any child

---

11. Although plain error review is generally not available in civil cases, *see Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44, 507 P.3d 357, it remains unresolved whether it is available in cases involving parental rights, *see id.* ¶ 42 n.10. Because neither party challenges the applicability of plain error review, and because we ultimately hold that the trial court did not plainly err, we need not resolve this question here. *See In re K.S.*, 2022 UT App 68, ¶ 22 n.7, 512 P.3d 497, *cert. denied*, 525 P.3d 1262 (Utah 2022); *Miner v. Miner*, 2021 UT App 77, ¶ 11 n.3, 496 P.3d 242.

being "sent or brought into a receiving state *for placement in foster care or as a preliminary to a possible adoption*, . . . [t]he child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child") (emphasis added). Under its plain terms, the ICPC applies when a child is sent to another state for "placement in foster care or as a preliminary to a possible adoption." *Id.* § 80-2-905 art. III(1), (2). Moreover, "placement" is defined, in relevant part, as "the arrangement for the care of a child in a family free, adoptive, or boarding home, or in a child-caring agency or institution." *Id.* § 80-2-905 art. II(4). And "a court of a party state" qualifies as a "sending agency." *Id.* § 80-2-905 art. II(2).

¶46   Here, the trial court, acting as the "sending agency," entered an order granting permanent guardianship of Child to Guardians—her aunt and uncle. Facially, it is unclear whether the permanent guardianship with out-of-state relatives constitutes a "placement in foster care" or "a preliminary to a possible adoption." Mother's argument on this point in her opening brief is limited to the assertion that "[w]hile the [ICPC] specifically refers to adoptions, its provisions apply to all out-of-state custody transfers of children" and that "Utah appellate courts have examined several cases of ICPC compliance in conjunction with custody-specific cases." She then cites three cases—*In re R.G.*, 2023 UT App 144, 540 P.3d 1148, *cert. denied*, 544 P.3d 459 (Utah 2024); *In re A.H.*, 2022 UT App 114, 518 P.3d 993, *rev'd*, 2024 UT 26, 554 P.3d 969; and *In re K.S.*, 2022 UT App 68—in which the ICPC was complied with before a child was sent to live with an out-of-state relative. But none of these cases directly addressed whether the ICPC applied to such situations. Rather, the ICPC was complied with in the proceedings before the trial court and, with the exception of *In re K.S.*, the applicability of the ICPC was not raised

on appeal.[12] *See In re R.G.*, 2023 UT App 144, ¶ 6; *In re A.H.*, 2022 UT App 114, ¶ 14; *In re K.S.*, 2022 UT App 68, ¶ 11. *See also In re A.H.*, 2024 UT 26, ¶ 10. And as for *In re K.S.*, this court did not reach the merits of the appellant's challenge regarding the applicability of the ICPC.

¶47 As discussed in *In re K.S.*, an out-of-state father challenged the juvenile court's decision to order "an expedited ICPC" instead of immediately placing his children with him after they had been removed from their mother's custody. 2022 UT App 68, ¶ 34 (quotation simplified). He argued "that the plain language of the ICPC indicates that its requirements apply only to placements for 'foster care' or for purposes of facilitating an 'adoption,' and not to placements with a noncustodial parent." *Id.* ¶ 35. This court recognized "a sharp split" among other jurisdictions that had addressed that question, *id.* ¶¶ 35–37, but we did not ultimately decide the issue, in part because it was not preserved and the father had not demonstrated plain error, *id.* ¶ 38. Specifically, this court held that because "no Utah appellate court has yet offered an interpretation of the ICPC in [that] context, and courts in other jurisdictions are sharply divided" on the issue, any alleged error

---

12. In our opinion in *In re R.G.*, 2023 UT App 144, 540 P.3d 1148, *cert. denied*, 544 P.3d 459 (Utah 2024), this court assumed, without analysis, that "an approved ICPC is a precursor to any out-of-state placement." *Id.* ¶ 28. Nevertheless, this court's decision did not turn on the applicability of the ICPC. Rather, this court affirmed on the ground that regardless of the outcome of the ICPC, the juvenile court's best-interest analysis was sufficient to foreclose placement with the out-of-state relative. *Id.*

Similarly, on certiorari, our Supreme Court stated in *In re A.H.*, 2024 UT 26, 554 P.3d 969, that the juvenile court ordered compliance with the ICPC because placing the children with their out-of-state grandparents "required compliance with the [ICPC]." *Id.* ¶ 10. But again, as discussed in detail in part Part I above, the applicability of the ICPC was not at issue in that case.

by the juvenile court in ordering "an expedited ICPC" was not obvious. *Id.* ¶ 38 (quotation simplified).

¶48 Similarly, Utah appellate courts have not addressed whether a permanent guardianship with out-of-state relatives constitutes "placement with foster care."[13] Utah Code Ann. § 80-2-905 art. III(1). The ICPC itself does not offer a ready answer. As concerns "placement in foster care," the ICPC's definition of "placement" contemplates, in pertinent part, "a family free" home or a "boarding home." *Id.* § 80-2-905 art. II(4). But the ICPC does not define either of these terms. The ICPC's regulations, which are promulgated by the Association of Administrators of the ICPC,[14] offer definitions, but it could readily be argued that some of those definitions only serve to muddy the issue even further. Also, an additional issue arises regarding whether, and if so, to what extent, the regulations apply if they contradict the language of the ICPC.

---

13. As concerns "a preliminary to a possible adoption," Utah Code Ann. § 80-2-905 art. III(1) (LexisNexis 2022), the trial court here expressly held that adoption was not strictly necessary or in Child's best interest and entered the permanent guardianship as an alternative to the adoption Guardians sought—not as a preliminary to adoption.

14. The ICPC provides,
> The executive head of each jurisdiction party to this compact shall designate an officer who shall be general coordinator of activities under this compact in his jurisdiction and who, acting jointly with like officers of the party jurisdictions, shall have power to promulgate rules and regulations to carry out more effectively the terms and provisions of this compact.

Utah Code Ann. § 80-2-905 art. VII (LexisNexis 2022).

¶49 For example, the regulations contradictorily define "family free" as "the home of *a relative or unrelated individual* whether or not the placement recipient receives compensation for care or maintenance of the child." American Public Human Services Association, *ICPC Regulations*, Reg. No. 3(4)(24), https://aphsa.org/wp-content/uploads/2024/10/ICPC-Regulations _TOC.pdf [https://perma.cc/VR5B-U3VG] (emphasis added). If the definition encompasses both relatives and non-relatives, the regulation seems to be at odds with the ICPC's reference to "family free." Additionally, that definition also indicates that it "has the same meaning as boarding home." *Id. See id.* Reg. No. 3(4)(8) (defining "[b]oarding home" and indicating that it "has [the] same meaning as family free"). These identical definitions run contrary to the well-accepted principle that "when interpreting a contract we attempt to give effect to each provision, and we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless" and that "an interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless, or inexplicable." *UDAK Props. LLC v. Canyon Creek Com. Center LLC*, 2021 UT App 16, ¶ 18, 482 P.3d 841 (quotation simplified), *cert. denied*, 509 P.3d 768 (Utah 2022). *See generally Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013) ("Interstate compacts are construed as contracts under the principles of contract law.").

¶50 In addition, the regulations define "foster care" as "24-hour substitute care for children placed away from their parents or guardians and for whom the state agency has placement and care responsibility," which "includes, but is not limited to, placements in foster family homes, *foster homes of relatives*, group homes, emergency shelters, residential facilities, child care institutions and pre-adoptive homes." American Public Human Services Association, *ICPC Regulations*, Reg. No. 3(4)(26), https://aphsa.org/wp-content/uploads/2024/10/ICPC-Regulations _TOC.pdf [https://perma.cc/VR5B-U3VG] (emphasis added). For

the same reason discussed above, the inclusion of "foster homes of relatives" in the definition potentially conflicts with the phrase "placement in foster care" where "placement" contemplates the child living in a "family free" home. Utah Code Ann. § 80-2-905 arts. II(4) & III(1).

¶51 Additionally, the ICPC expressly does not apply to "[t]he sending or bringing of a child into a receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state." *Id.* § 80-2-905 art. VIII(1). In other words, the ICPC does not apply when any of the listed relatives send the child out-of-state of their own accord. Although this provision is inapplicable here because the trial court acted as the "sending agency," the regulations have expanded this provision by directing that "[p]lacement of a child requires compliance with the [ICPC] if such placement is . . . . with parents and relatives when a parent or relative is not making the placement." American Public Human Services Association, *ICPC Regulations*, Reg. No. 3(2)(a)(3), https://aphsa.org/wp-content/uploads/2024/10/ICPC-Regulations_TOC.pdf [https://perma.cc/VR5B-U3VG]. This regulation appears to assume that anything falling outside of the exceptions listed in article VIII(1) are governed by the ICPC, regardless of article III's provision that the ICPC applies to children sent out of state "for placement in foster care or as a preliminary to adoption." Utah Code Ann. § 80-2-905 art. III(1). This regulation also potentially conflicts with the ICPC's definition of "placement," which expressly contemplates "family free" homes. *Id.* § 80-2-905 art. II(4).

¶52 Believe it or not, this is not a comprehensive discussion of the many considerations relating to the determination of whether a permanent guardianship with an out-of-state relative—specifically an adult uncle and aunt—falls under the ambit of the ICPC. And again, we do not answer this question here. As discussed above, a key element of a successful plain error

challenge is that any alleged error must have been obvious. *See In re K.S.*, 2022 UT App 68, ¶ 22, 512 P.3d 492, *cert. denied*, 525 P.3d 1262 (Utah 2022). "For an error to be obvious to the trial court, the party arguing for [plain error] must show that the law governing the error was clear or plainly settled at the time the alleged error was made." *State v. Johnson*, 2017 UT 76, ¶ 21, 416 P.3d 443 (quotation simplified).

¶53    Notwithstanding the problems outlined in the foregoing paragraphs, Mother's argument that the error was obvious is limited to asserting that article III(2)(f) of the ICPC is clear that "[c]ourts *must* comply with the ICPC when transferring custody to an individual or agency that is out of state." But Article III(2)(f) is not as expansive as Mother asserts. It states,

> The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

Utah Code Ann. § 80-2-905 art. III(2)(f). Earlier on, article III clarifies that "[t]he child" to which article III(2)(f) refers is "any child to be sent or brought into a receiving state *for placement in foster care or as a preliminary to a possible adoption.*" *Id.* § 80-2-905 art. III(2) (emphasis added). Accordingly, article III(2)(f) is not a silver bullet that resolves the rather complicated question of whether the permanent guardianship with Guardians constituted a "placement in foster care."

¶54    Mother has not meaningfully addressed this question on appeal. As discussed above, Mother's reliance on three Utah cases was insufficient to establish that this issue has been resolved by Utah courts. To the contrary, Utah appellate courts have not previously decided this issue. Mother also has not addressed whether courts of other jurisdictions have addressed this issue,

much less argued that they are all in agreement and that no split exists among them. *See In re K.S.*, 2022 UT App 68, ¶ 38 (discussing the split in authority as a relevant consideration regarding whether an error is obvious). For these reasons, Mother has not carried her burden in arguing that any alleged error was obvious, and Mother's plain error challenge fails.

2.      Ineffective Assistance of Counsel

¶55     To succeed on a claim of ineffective assistance of counsel, the appellant must show both that (1) trial counsel's "performance was deficient" and (2) "the deficient performance prejudiced the defense." *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim." *State v. Samora*, 2023 UT 5, ¶ 21, 529 P.3d 330 (quotation simplified). Here, because we hold that Mother's court-appointed counsel did not perform deficiently in not requesting ICPC compliance, Mother's claim of ineffective assistance fails, and we need not address the prejudice prong of the inquiry.

¶56     "Judicial scrutiny of counsel's performance" is "highly deferential," meaning the appellant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, "even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (quotation simplified). Rather, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶57     Mother argues that "counsel's performance was deficient for failing to raise an obvious statutory bar to the district court's order of permanent custody and guardianship." She further asserts that "[a]ny counsel representing parents in guardianship

actions should be aware that all out of state transfers of a child are subject to procedural protections under the ICPC." Mother's argument is entirely premised on the assertion that the ICPC's application to permanent guardianships with out-of-state relatives is obvious and that counsel therefore performed deficiently by not raising such an obvious statutory prerequisite to the permanent guardianship. But, for the reasons discussed in Part II.A.1 above, the ICPC's application to the situation presented in this case was far from obvious. Accordingly, Mother's ineffective assistance claim likewise fails.

B.    Unfitness

¶58    Parental rights may be terminated "for the purpose of facilitating the adoption" of a child, Utah Code Ann. § 78B-6-112(1) (LexisNexis 2022), only if the district court finds both that "(1) one or more of the statutory grounds for termination are present and (2) termination of the parent's rights is in the best interests of the child," *In re adoption of J.E.*, 2024 UT App 34, ¶ 10, 546 P.3d 972 (quotation simplified). *See* Utah Code Ann. § 78B-6-112(5)(e) (stating that a court may terminate parental rights if "the individual's parental rights are terminated on grounds described in Title 80, Chapter 4, Termination and Restoration of Parental Rights, and termination is in the best interests of the child"). The statutory grounds for termination under the first prong are currently located in Utah Code section 80-4-301, one of which is when "the parent is unfit or incompetent." *See* Utah Code Ann. § 80-4-301(1)(c) (LexisNexis 2022). Here, the trial court found that Mother was "unfit because of her habitual use of dangerous drugs that render her unable to care for" Child.[15] *See id.* § 80-4-302(2)(c) (Supp. 2023) (stating that

---

15. Here, under the second prong, the trial court found that termination of Mother's parental rights was not strictly necessary to promote Child's best interest and ordered a permanent

(continued…)

in determining whether a parent is unfit, the court "shall consider . . . habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child").

¶59   Mother argues that the trial court erred in finding that a statutory ground for termination—i.e., unfitness—existed because it did not follow the statutory mandate that

> [i]f a child is not in the physical custody of the child's parent or parents, the juvenile court, *in determining whether parental rights should be terminated*, shall consider . . . the effort the child's parent or parents have made to adjust the parent's or parents' circumstances, conduct, or conditions to make it *in the child's best interest* to return the child to the child's home after a reasonable length of time.

*Id.* § 80-4-303(1)(b) (2022) (emphasis added). In light of this statute, Mother argues that the trial court erred by focusing on her past struggles with substance abuse without considering her most recent recovery efforts.

¶60   Even accepting Mother's characterization of the trial court's unfitness analysis as correct, this argument nonetheless fails. By its plain terms, section 80-4-303(1)(b) applies to the best-interest determination—not to the determination whether statutory grounds for termination exist. *See In re J.A.L.*, 2022 UT 12, ¶ 20, 506 P.3d 606 (stating that "in a case where the child is not in the parent's physical custody, the court must consider a set of specific considerations *in assessing whether termination is strictly*

guardianship. Mother does not challenge the trial court's best interest analysis, much less argue that the best interest analysis under the Adoption Act differs from the analysis set forth in Utah Code section 80-4-301(1).

*necessary in the best interest of children*," including the consideration currently set forth in section 80-4-303(1)(b)) (emphasis added; quotation simplified). And here, notwithstanding its conclusion that there were grounds for termination, the court determined it was not in Child's best interest to terminate Mother's parental rights. Accordingly, the trial court did not err by not applying section 80-4-303(1)(b) to its analysis regarding whether Mother was unfit.

## CONCLUSION

¶61 Mother's arguments challenging the probate guardianship are moot, and we therefore do not reach their merits. Mother has not shown plain error or ineffective assistance of counsel relating to any alleged failure to comply with the ICPC. The trial court also did not err in concluding that Mother was unfit.

¶62 Affirmed.

_____